BARNES, J.,
for the Court:
¶ 1. Dr. Nancy Weible filed suit against the University of Southern Mississippi (USM) and Dr. Jane Siders over breach of an alleged contract Dr. Weible maintained was created between the parties, who were trying to run an innovative joint day *55 care involving typical and special-needs children, with sick-child care. In her complaint, Dr. Weible claimed breach of contract, detrimental reliance, negligent misrepresentation, negligent and intentional infliction of emotional distress, and slander. At trial, the Circuit Court of Forrest County found there to be no express contract and granted the Defendants’ motion for a directed verdict on all non-Mississippi Tort Claims Act (MTCA) claims, which included breach of express contract and the intentional torts of slander and intentional infliction of emotional distress. The trial court then proceeded, without a jury, to hear the remaining MTCA claims. The trial court found that an implied contract existed, but the court determined that the Defendants did not breach the implied contract, dismissing Dr. Weible’s claims for breach of implied contract, equitable and promissory estoppel, detrimental reliance, and the unintentional torts of misrepresentation and negligent infliction of emotional distress. Dr. Weible now appeals. Finding no error, we affirm.
STATEMENT OF THE FACTS AND PROCEDURAL HISTORY
¶ 2. Dr. Weible, a family-practice physician, had an idea to open Mississippi’s first private sick-child daycare for children with mild to moderate illnesses. Thus, in the spring of 2002, she opened Mother’s Touch Sick Child Daycare in Hattiesburg, Mississippi, which was two blocks away from her medical office. The concept was that the daycare would care for sick children who could not attend their regular daycare. Mother’s Touch initially took only sick children, but then it began to serve well infants, in addition to well children with special needs. However, after a year of operation, the daycare was not profitable. Dr. Weible was able to negotiate a substantial corporate sponsorship with Forrest General Hospital for its employees, though, because of her medical contacts with the hospital.
¶ 3. In the spring of 2003, while looking for additional corporate sponsors for Mother’s Touch, Dr. Weible contacted Dr. Siders, executive director of USM’s Institute for Disability Services, about implementing a joint project incorporating the sick-child daycare with a daycare for children with special needs. Dr. Weible could then utilize USM’s resources, such as grant funding, to help operate and promote the daycare, and USM could use the daycare as a training facility for its students. Dr. Siders was enthusiastic about the idea.
¶ 4. More space would be needed for the joint project in the future, and the building next to Mother’s Touch became available. Dr. Weible signed a lease for the additional building as USM could not sign lease agreements. The joint daycare began operating under Dr. Weible’s existing daycare license for Mother’s Touch, but as soon as USM satisfied all Mississippi Department of Health (MDH) requirements, Dr. Weible wanted to relinquish her license to USM. The initial plan was for USM to take over the personnel, equipment, and running of the well- and sick-child daycare, and Dr. Weible would oversee the sick-child daycare as medical director.
¶ 5. In July 2003, the joint project began. In September 2003, Dr. Siders sent a letter to parents explaining that Mother’s Touch had formed a “partnership” with the University Center for Excellence at USM (the Center),[1] and the well-child *56 daycare would be known as the Families First Children’s Center (Families First). The program served children with and without special needs.
¶ 6. In August 2003, USM purchased new equipment to upgrade the daycare facility and approximately $7,943 in used equipment from Dr. Weible to help her pay the daycare’s bills. The provost of USM, Dr. Tim Hudson, approved the uncustomary purchase. USM began paying the salaries of all employees at the daycare, excluding an on-site nurse, whom Dr. Weible paid to tend to the sick children for forty hours per week. For the first four months of operation, Dr. Weible kept all of the daycare fees (for both sick and well children) because, until USM received its daycare license, it could not accept daycare fees.
¶ 7. In August, the parties also began trying to negotiate a written contract of each others’ responsibilities, as the joint project continued to operate. Dr. Siders explained to Dr. Weible that USM required her to outline Dr. Weible’s scope of work, which would be a component of the proposed contract. The contract would then be reviewed by USM’s legal department. Dr. Siders did not have authority to sign contracts for USM. In September, Dr. Siders drafted the scope-of-work document which laid out Dr. Weible’s responsibilities, but Dr. Weible rejected it as “too vague.” Dr. Siders also clarified to Dr. Weible that the scope-of-work document was not “the contract.”
¶ 8. E-mails between Dr. Weible and Dr. Siders continued from August 2003 through December 2003 about ironing out the details of their partnership. In September 2003, Dr. Weible expressed frustration that there still was no written contract, and she questioned the wisdom of starting the joint project before getting “things in writing.” In November 2003, Dr. Siders stated “the contract” was just about ready for Dr. Weible to review. In early December, Dr. Siders proposed a third scope-of-work document, which was again rejected by Dr. Weible.
¶ 9. Also, from August to December 2003, various disagreements arose about the day-to-day operation of the daycare, such as hours, sick-child staffing, nurse qualifications, transfer of Dr. Weible’s daycare license, division of fees, Dr. Weible’s consulting fee, and marketing, to name a few. Mother’s Touch was still operating at a deficit, and Dr. Siders stated that USM could not cover all of its costs. As early as September 2003, Dr. Weible also discussed the possibility with Dr. Siders of just closing the sick-child daycare and letting USM run the well-child daycare for typical and special-needs children. Dr. Siders explained that USM did not want to take over Mother’s Touch, but she thought the sick-child daycare was a good idea. That said, Dr. Siders and the staff did have several concerns expressed to Dr. Weible about the sick-child daycare, such as which sicknesses to allow, the serving of food to sick children, and staff moving between the well- and sick-child areas. Dr. Weible felt these concerns were unfounded and became frustrated.
¶ 10. Another major source of contention was over the qualifications of one of the medical personnel Dr. Weible had working in the sick-child area. The daycare’s manual represented to parents that an on-site licensed “nurse” would be present at the daycare when sick children were present. Dr. Siders discovered the “nurse” was actually only licensed as a “medical assistant”; she expressed her concern to Dr. Weible that this was a *57 misrepresentation to the parents. Dr. Weible maintained the “nurse,” who actually worked at her medical clinic as well, was more than qualified for the job. Dr. Weible testified that, at the time, she was willing to change the terminology in the manual, but they “never got to that point.” Dr. Siders testified she requested that Dr. Weible tell the parents that the employee was a “medical assistant” and not a nurse, but Dr. Weible refused. Dr. Siders also told Dr. Weible that she could not in good faith take over the licensure of the sick-child daycare and continue this misrepresentation.
¶ 11. In December 2003, relations between the parties became even more strained. As Dr. Weible admitted, there were still unresolved issues about space, fees, funding, administrative control, licen-sure, and liability. There was still no written contract, and Dr. Weible became increasingly frustrated over this fact. Dr. Weible felt that Dr. Siders was not supportive of the sick-child daycare idea anymore; however, Dr. Siders indicated she was nonetheless positive about the joint project.
¶ 12. In mid-December 2003, negotiations between the parties completely broke down. Dr. Weible again considered closing the sick-child part of the daycare. On or about December 16, 2003, Dr. Weible emailed Dr. Siders that Dr. Siders and USM had not fulfilled their part of the “agreement,” “jumped in” before they knew what they could do, and the parties “never finalized the details about staffing and responsibilities.” Dr. Weible stated: “USM has made me look very bad to the hospital and the community.” The next day, Dr. Siders talked to Troy Daniels, head of human resources at Forrest General Hospital, who stated he understood USM’s concerns about taking children with the more serious illnesses like the flu. He also emphasized that Dr. Weible’s reputation and relationship with the hospital had not and would in no way be damaged by the possible closing of Mother’s Touch. Daniels also thought the hospital would consider “buying slots” at the daycare even if children with the flu were not accepted. Dr. Siders relayed Daniels’s comments to Dr. Weible, who later accused Dr. Siders of slander for the conversation.
¶ 13. On January 15, 2004, Dr. Weible e-mailed MDH that she would be closing the sick-child daycare on January 31, 2004, and that USM would be occupying the buildings and pursue its licensure. Dr. Weible copied Dr. Siders in the e-mail and also sent a separate e-mail to Dr. Siders the same day instructing her to contact MDH about the daycare license and to contact the lessor about taking over the buildings’ leases. Therefore, Dr. Siders wrote the Center’s parents a letter on January 21, 2004, notifying them that Mother’s Touch would be closing and the entire daycare would become licensed as Families First Children’s Center, run by USM. Furthermore, there would no longer be a sick-child daycare. On January 22, Dr. Weible also sent a letter to parents explaining that she was closing Mother’s Touch because she could no longer financially support it.
¶ 14. Six days later, however, on January 28, 2004, Dr. Weible e-mailed Dr. Sid-ers that she had changed her mind and decided to keep Mother’s Touch open. She also e-mailed MDH her change in plans. On the same day, Dr. Weible and her husband met with the provost, Dr. Hudson, about the daycare situation. Later in the day, Dr. Weible sent Dr. Hudson a letter informing him of USM’s “breach of verbal contract” and discussing how to make an “amenable solution to this rather complicated situation.” In the letter, she *58 requested: a payment of approximately $17,118, which included back rent on both buildings, child-care fees for December 2003 and January 2004, and all back utilities; nonremoval, for three months, of the equipment USM had bought from her; and assumption of the lease on the second building. Alternatively, if USM wished to keep the two buildings and proceed with its program, USM could buy out Mother’s Touch for $60,000. In return, Dr. Weible would not pursue further legal action.
¶ 15. On Saturday, January 31, 2004, a USM daycare employee went to the daycare to retrieve some materials. She was met at the door by Dr. Weible’s husband, who informed the employee that he had an injunction against USM, and no USM employee could enter the building. Additionally, Dr. Weible’s husband changed the locks on the doors. The daycare still contained the equipment that USM had bought from Dr. Weible, as well as the new equipment USM had purchased for the daycare, and the personal belongings of USM employees.
¶ 16. Dr. Weible continued to run Mother’s Touch daycare for several months until it finally closed in approximately May 2004. Dr. Weible sold the daycare, along with the equipment USM had bought from her, to a third party. USM had put approximately $133,000 into the joint project. Dr. Siders maintained that USM “never backed out” of the partnership; instead, USM was “locked out” by Dr. Weible.
¶ 17. Dr. Weible filed her complaint against USM and Dr. Siders, seeking recovery for emotional damages, humiliation, and mental anxiety for alleged breach of contract. Soon after, Dr. Weible amended her complaint to add certain other contractual claims such as detrimental reliance and estoppel. The Defendants filed separate motions for summary judgment, both of which were denied by the trial court. A three-day trial ensued. The trial court granted a directed verdict on Dr. Weible’s non-MTCA claims and dismissal of the remaining MTCA claims after a bench trial.
STANDARD OF REVIEW
¶ 18. An appellate court reviews a trial court’s grant or denial of a motion for a directed verdict de novo. Solanki v. Ervin, 21 So.3d 552, 556 (¶ 8) (Miss.2009). “A motion for directed verdict tests the legal sufficiency of the plaintiffs evidence.” Id. In deciding whether to grant a motion for a directed verdict:
[T]he trial judge is to look solely to the testimony on behalf of the party against whom a directed verdict is requested. He will take such testimony as true along with all reasonable inferences which can be drawn from that testimony which is favorable to that party, and, if it could support a verdict for that party, the directed verdict should not be given.
Id. (quoting White v. Thomason, 310 So.2d 914, 916-17 (Miss.1975)). “In considering the evidence and all reasonable inferences, the court must determine whether the evidence is so overwhelmingly against the nonmovant that no reasonable juror could have found in her favor.” Id. (quoting Fox v. Smith, 594 So.2d 596, 603 (Miss.1992)). The appellate court considers “whether the evidence, as applied to the elements of a party’s case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.” Id. (quoting Spotlite Skating Rink, Inc. v. Barnes, 988 So.2d 364, 368 (¶ 10) (Miss.2008)).
¶ 19. The standard of review for a judgment entered following a bench trial is well established. “The trial court is entitled to the same deference accorded to a chancellor, that is, we will uphold the trial court’s findings of fact, so long as they are supported by ‘substantial, credible, and rea *59 sonable evidence.’ ” City of Jackson v. Presley, 40 So.3d 520, 522 (¶ 9) (Miss.2010) (quoting City of Jackson v. Brister, 888 So.2d 274, 277-78 (¶ 13) (Miss.2003)). Conclusions of law, however, are reviewed de novo. Id.
ANALYSIS
¶ 20. Dr. Weible raises several issues. As many of her issues are interrelated, we will combine them for efficiency’s sake.
¶ 21. Dr. Weible claims the trial court’s grant of a directed verdict was improper; the jury should have been allowed to resolve the case, especially since the trial court had denied the Defendants’ motion for summary judgment earlier in the proceedings. Specifically, Dr. Weible contends that the jury should have decided whether there was a contract, claims for intentional torts, and damages. Dr. Wei-ble also argues that the trial court should have addressed whether there was substantial or partial performance of the contract and allowed the jury to consider this matter. Finally, Dr. Weible maintains there was overwhelming evidence to support her claims for the unintentional torts of estoppel and detrimental reliance.
I. Non-MTCA Claims: Breach of Express Contract and Intentional Torts
¶ 22. The trial court granted a directed verdict on Dr. Weible’s non-MTCA causes of action, which included breach of express contract, slander, and intentional infliction of emotional distress. The trial court found insufficient evidence from which a jury could find an express contract; thus, Dr. Weible could not be damaged by the actions of the Defendants.
A. Breach of Express Contract
¶23. Dr. Weible argues the jury should have decided whether there was an express contract. She insists that there was a written contract which was followed by substantial performance. However, the “core agreement” in writing, Dr. Wei-ble maintains, is not one document but an “amalgam” of twenty-seven[2] exhibits entered into evidence at trial, and the three exhibits attached to her complaint. These exhibits include the 191-page Mother’s Touch policy and procedure manual; invoices and accounting sheets from the daycare; USM purchase orders; e-mail correspondence between the parties; correspondence to the daycare parents; grant applications; and the scope-of-work drafts, to name a few.
¶ 24. “[I]n any suit for breach of contract, the plaintiff has the burden of proving by a preponderance of the evidence the existence of a valid and binding contract, that the defendant has broken or breached it, and that the plaintiff has suffered monetary damages as a result.” Garner v. Hickman, 733 So.2d 191, 195 (¶ 15) (Miss.1999) (citing Warwick v. Matheney, 603 So.2d 330, 336 (Miss.1992)). “The existence of a contract and its terms are questions of fact to be resolved by the fact-finder, whether a jury or a judge in a bench-trial.” Gandy v. Estate of Ford, 17 So.3d 189, 192-93 (¶ 6) (Miss.Ct.App.2009) (quoting Anderson v. Kimbrough, 741 So.2d 1041, 1045 (¶ 12) (Miss.Ct.App.1999)). “Questions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact-finder,” and they are reviewed de novo. Id. at 193 (citing G.B. “Boots” *60 Smith Corp. v. Cobb, 860 So.2d 774, 777 (¶ 6) (Miss.2003)).
¶ 25. The Mississippi Supreme Court has confirmed that the State is not immune from suit for breach of its written contractual obligations. City of Jackson v. Estate of Stewart ex rel. Womack, 908 So.2d 703, 710-11 (¶¶ 35-36) (Miss.2005); see also Estate of Spiegel v. Western Sur. Co., 908 So.2d 859, 863-64 (¶ 18) (Miss.Ct.App.2005) (stating Stewart reaffirmed that the MTCA does not apply to actions for breach of express contract). Many of Dr. Weible’s contract arguments, however, concern issues regarding implied contracts, such as promissory and equitable estoppel, detrimental reliance, and quantum meruit. The Mississippi Supreme Court has interpreted the Mississippi Code Annotated section 11-46-5 (Rev.2002) of the MTCA to provide a limited waiver of immunity for breach of implied terms of contract to “the extent of the maximum amount of liability” allowed under Mississippi Code Annotated section 11-46-15 (Rev.2002). See Stewart, 908 So.2d at 711 (¶ 38). For the purposes of this case, the maximum amount allowed by section 11-46-15 is $500,000. While the factual issues regarding the existence and breach of express contract are matters for a jury to consider, the other issues related to an implied contract are questions for the judge to decide, as implied-contract issues come under the MTCA and are decided in a bench trial. Dr. Weible, to a large extent, has made no attempt to distinguish between which theories relate to express contract versus implied contract. We have done our best to do so.
¶26. USM is under the management and control of the Board of Trustees of the State Institutions of Higher Learning (Board). Miss.Code Ann. § 37-101-15(b) (Supp.2011). The Board has general supervision of the affairs of all Institutions of Higher Learning and schools, such as the “business methods and arrangement of accounts and records,” and “all other matters incident to the proper functioning of the institutions.” Id. The Legislature has granted the Board the authority to promulgate bylaws to govern its actions. Miss.Code Ann. § 37-101-15(c) (Supp. 2011). Under this authority, the Board adopted Bylaw 707.01 to govern the approval and execution of contracts: “Institutional Executive Officers and the Commissioner are authorized and empowered to approve and execute on behalf of their respective institutions all other[3] land, personal property and service contracts. All such contracts shall be executed in accordance with state law and board policy.” Institutions of Higher Learning Bylaw 707.01. Bylaw 701.02 authorizes the “Institutional Executive Officer of each institution, or a designee as evidenced in writing ... to sign all other official documents for and on behalf of the institution for which he or she is responsible. Anyone who signs a contract without authorization is subject to disciplinary action, up to and including termination.”
¶ 27. In Mississippi, “where a particular manner of contracting is prescribed” with respect to public contracts, “the manner is the measure of power and must be followed to create a valid contract.” Bruner v. Univ. of S. Miss., 501 So.2d 1113, 1115 (Miss.1987) (quoting Am. *61 Book Co. v. Vandiver, 181 Miss. 518, 528, 178 So. 598, 600 (1938)). In the case before us, Dr. Siders did not have the authority to bind USM to a written contract, even if one had been formed. Further, Dr. Siders testified that Dr. Weible was well aware of Dr. Siders’s contracting limitations. In an e-mail to Dr. Weible in December 2003, Dr. Siders specifically explained that “our attorney does not get involved until the agreement is put in writing.” The parties never reached this point in their negotiations.
¶28. Dr. Weible argues twenty-seven documents “reflect the agreement,” which was “reduced to writing.” She claims that the letter Dr. Siders wrote to the parents of the Center in September 2003, stating that “Mother’s Touch has formed a partnership” with USM, is a “partnership agreement” between the parties. The letter explained that Mother’s Touch would continue to operate as a sick-child daycare, and USM had assumed responsibility for the well-child care, which would be known as Families First. The letter went on to discuss the services offered by the daycare. Dr. Weible also claims the Mother’s Touch policy and procedural manual is a 191-page contract. She argues this exhibit, when read with the “partnership agreement,” describes “the essential agreement between USM and Mother’s Touch.”
¶ 29. Additionally, Dr. Weible points to the first scope-of-work document Dr. Siders sent Dr. Weible in September 2003 as evidence of a contract, because the document was entitled “Contract between Families First Children’s Center, Institute for Disability Studies, [USM], and Mother’s Touch Sick Child Daycare.” However, as Dr. Siders explained to Dr. Weible, at the time of the letter and at trial, this document was not a contract between the parties, even though it had the word “contract” in the title; instead, it was merely a list of services Dr. Weible was to provide. Examination of this document shows it was definitely not a contact, or evidence of a contract, between the parties. The document was required by USM before a contract could be drafted. The scope-of-work document would be attached to the written contract. There was nothing in the document about USM’s or Dr. Sider’s obligations. Regardless, Dr. Weible never agreed to any of the three scope-of-work documents Dr. Siders drafted but rejected them as “too vague.” Moreover, none of these documents was executed in accordance with Bylaw 707.01.
¶ 30. We are not persuaded that there was sufficient evidence from which a jury could find an express contract between the parties. Dr. Weible maintains that any time the parties use the word “contract,” “agreement,” or “partnership” in their communications or testimony, it is proof there was a binding, valid contract between the parties. We disagree. A letter to the daycare parents stating there was a “partnership” with USM is not a “partnership agreement.” Nor were e-mail communications referring to the parties’ “agreement” evidence of an express contract.
¶ 31. The record shows the parties were amicably trying to work out the terms of their contract from July 2003 through December 2003, but they could not agree to either large or small matters. While it is true that the joint project started before there was any type of written agreement in place, Dr. Weible acknowledged the risks involved in operating in this manner. She expressed her concern several times to Dr. Siders; however, the record does not indicate that “constant, pervasive impediments were thrust upon Dr. Weible by the Defendants” to purposefully or maliciously thwart the formation of an express contract, as Dr. Weible con *62 tends. Nor does the record show that the Defendants wanted “to squeeze out Dr. Weible” and leave her “out in the cold.” Both parties genuinely and reasonably disagreed on numerous terms of their joint endeavor, but they were attempting to work them out until January 2004, when Dr. Weible unilaterally locked the daycare’s doors.
¶ 32. Additionally, we find no evidence that the Defendants “unilaterally prevented the joint project from continuing” in January 2004, as alleged by Dr. Weible. In fact, the record shows just the opposite. On January 14, 2004, Dr. Weible notified Dr. Siders that she was closing Mother’s Touch and that USM should take over her facility and daycare license. Then, two weeks later, Dr. Weible changed her mind and wrote a demand letter to USM, after her meeting with Dr. Hudson. We note that if one party prevents performance of an agreement, she cannot sue for breach of contract, but is liable for breach of contract. See Callicott v. Gresham, 249 Miss. 103, 111, 161 So.2d 183, 186 (1964) (citing 12 Am.Jur. Contracts § 386 (1938 & Supp.1964)) (“If one party to a contract prevents another party from carrying out his part of the agreement, he becomes liable in damages for the breach of the contract.”); Restatement (First) of Contracts § 315(1) (1932) (“Prevention or hindrance by a party to a contract ... is breach of contract.”). As the trial court noted, Dr. Weible terminated the parties’ relationship by unilaterally locking out the daycare’s employees, changing the locks, and obtaining an injunction against all USM employees’ entry into the daycare. Any formation of a possible contract would have been terminated by these actions.
¶ 33. Dr. Weible next argues that substantial or partial performance created obligations between the parties and is evidence of an express contract as “it is unlikely the State would proceed in the absence of a contract.” She claims that substantial performance entitles her to relief “on either the contract or on a quantum meruit basis.” She argues that the trial court erred in not allowing the jury to address these theories. She cites to Wunderlich v. State Highway Commission, 183 Miss. 428, 184 So. 456 (1938) and Section 34 of the Second Restatement of Contracts. We find that neither supports her contention that the jury could have viewed her partial performance as evidence of an express contractual agreement with USM.
¶ 34. In Wunderlich, the Mississippi Supreme Court held that the State Highway Commission was liable for breach of a road-construction contract, just as any other private contracting party would be. Wunderlich, 184 So. at 458-59. In Wunderlich, however, there was a detailed, written, properly executed contract between the parties; the case did not utilize partial performance to establish the existence of a contract. See id. at 456-57, 184 So. 456.
¶ 35. Similarly inapplicable is Dr. Wei-ble’s citation of Section 34 of the Second Restatement of Contracts entitled “Certainty and Choice of Terms; Effect of Performance or Reliance”:
(1) The terms of a contract may be reasonably certain even though it empowers one or both parties to make a selection of terms in the course of performance.
(2) Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed.
(3) Action in reliance on an agreement may make a contractual remedy appropriate even though uncertainty is not removed.
*63 Restatement (Second) of Contracts § 34 (1981). The comment explains: “If the agreement is otherwise sufficiently definite to be a contract, it is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties.” Restatement (Second) of Contracts § 34 cmt. a. In the case before us, the issue was not uncertainty, but disagreement between the parties. Dr. Wei-ble expressly rejected the terms of the agreement in the scope-of-work documents, and the parties continued to disagree over the terms throughout their negotiations. Additionally, the Restatement states: “An offer can be accepted by the rendering of performance only if the offer invites such an acceptance.” Restatement (Second) of Contracts § 53(1). Here, there was no such offer. Dr. Weible was well aware that once the terms of the agreement were finalized, the matter would be submitted to USM’s legal counsel and formally executed.
¶ 36. Dr. Weible maintains “all of the parties agreed” that there was substantial or partial performance of the contract. We disagree. The Defendants acknowledged that while the joint project operated, the parties were working toward a contract, but it never occurred. There cannot be substantial or partial performance of terms that were never agreed upon.
¶ 37. Dr. Weible also questions why USM would put approximately $133,000 into a project when there was no agreement. At this point in time, Dr. Siders and USM probably question the wisdom of doing so. However, at the time the joint project was initiated, both parties saw an opportunity to help each other and their community; each could use the others’ assets and training to make a daycare— which was already functioning as Mother’s Touch — grow into the idea Dr. Weible envisioned. There is no doubt Dr. Weible needed USM’s financial resources as Mother’s Touch had been unprofitable. And it appears both parties, at least initially, had no doubt about the success of their joint venture.
¶ 38. Dr. Weible also cites Cig Contractors, Inc. v. Mississippi State Building Commission, 399 So.2d 1352 (Miss.1981) for the proposition that the State cannot enter into a written agreement with a private individual, allow substantial performance by the individual, and then “walk away from its obligation.” Cig Contractors is distinguishable as there was no dispute as to whether a written contract existed. The State Building Commission had contracted with the Appellant for the construction of a facility at the University of Mississippi. Id. at 1353. Cig filed a declaration in circuit court seeking damages against the State Building Commission for breach of contract. The Commission filed a demurrer, which the trial court sustained. The demurrer was based partially on the fact the Commission was not subject to sovereign immunity. Id. at 1354. The Mississippi Supreme Court reversed and remanded the case to the trial court because immunity for the State is waived on breach-of-contract claims: “Where the state has lawfully entered into a business contract with an individual, the obligations and duties of the contract should be mutually binding and reciprocal. There is no mutuality or fairness where a state or county can enter into an advantageous contract and accept its benefits but refuse to perform its obligations.” Id. at 1355. Here, it is undisputed that sovereign immunity does not relieve USM of its obligations under an express contract — the question is whether an express contract was entered into by the parties.
¶ 39. After a careful and thorough review of the numerous documents and ex *64 hibits in the record, we conclude, as did the trial court, that there was insufficient evidence from which a jury could find an express contract between the parties. Therefore, the trial court did not err in directing verdict against Dr. Weible on her claim of the breach of an express contract.
B. Intentional Torts
¶ 40. Dr. Weible argues the trial court erred in granting a directed verdict on her claims of intentional tort, which would include intentional infliction of emotional distress and slander. Section 11-46-5(2) of the MTCA provides that “an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee’s conduct constituted fraud, malice, libel, slander, defamation or any criminal offense other than traffic violations.” While slander is specifically mentioned by this section of the MTCA, intentional infliction of emotional distress is not. Neither of the parties has questioned the trial court’s inclusion of this tort claim as one to be tried by a jury. The Mississippi Supreme Court has held that torts which require proof of malice as an essential element are excluded from the MTCA under this section. See Zumwalt v. Jones County Bd. of Supervisors, 19 So.3d 672, 688-89 (¶¶ 83-84, 86) (Miss.2009) (Claim of tor-tious interference with business contracts requires proof of malice and is, therefore, not subject to the MTCA, but conversion, an intentional tort which does not require proof of fraud, malice, libel, slander, or defamation, is subject to the MTCA.). Intentional infliction of emotional distress can be predicated on behavior that is “malicious, intentional, willful, wanton, grossly careless, indifferent or reckless.” Summers ex rel. Dawson v. St. Andrew’s Episcopal Sch., Inc., 759 So.2d 1203, 1211 (¶ 34) (Miss.2000) (quoting Leaf River Forest Prods., Inc. v. Ferguson, 662 So.2d 648, 659 (Miss.1995)) (emphasis added). Thus, to the extent intentional infliction of emotional distress is predicated on malicious conduct, the claim would be outside the scope of the MTCA. Wé find that the trial judge correctly reviewed the claim for intentional infliction of emotional distress under the directed-verdict standard, as a finding of malice would have been for the jury to decide.
¶ 41. In order to prevail on a claim for intentional infliction of emotional distress, the severity of the conduct at issue must be “so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.” Speed v. Scott, 787 So.2d 626, 630 (¶ 18) (Miss.2001) (quoting Pegues v. Emerson Elec. Co., 913 F.Supp. 976, 982 (N.D.Miss.1996)). Generally, “meeting the requisites of a claim for intentional infliction of emotional distress is a tall order in Mississippi.” Id. at (¶ 19) (quoting Jenkins v. City of Grenada, 813 F.Supp. 443, 446 (N.D.Miss.1993)). Actions that have been found to evoke the requisite outrage have been “a plot by a girlfriend and her parents to hide the child of an unwed father, arranging for the baby to be adopted by strangers while the father pursued a custody suit.” Id. at (¶ 17) (citing Smith v. Malouf, 722 So.2d 490, 498 (Miss.1998)). Another example of sufficient outrageous conduct is a car dealership forging a customer’s name on a sales contract and selling “the contract to a finance company, resulting in the customer’s credit being damaged.” Id. (citing T.G. Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481, 486 (Miss.1972)). See also Lyons v. Zale Jewelry Co., 246 Miss. 139, 143, 150 So.2d 154, 155 (1963) (A demurrer on a claim of mental anguish was improper *65 where a debt collector abused a woman over the telephone, calling her a “damn liar,” a “g.. d... bitch,” and threatening to send her to jail along with her son, the actual debtor. The incident caused her extreme shock, hysteria, and disabled her from performing her work.). “[Liability ... does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities.” Brown v. Inter-City Fed. Bank for Sav., 738 So.2d 262, 265 (¶ 9) (Miss.Ct.App.1999) (quoting Lawson v. Heidelberg E., 872 F.Supp. 335, 338 (N.D.Miss.1995)). We find the trial court did not err in dismissing this claim. There was no evidence of any outrageous or extreme conduct in the record. Dr. Weible contends her competency was constantly challenged by the Defendants, who intentionally stole her idea and established their own daycare center after cutting Dr. Wei-ble out of the joint project.
¶ 42. We agree with the trial court that there was no evidence of “outrageous conduct” on the part of the Defendants which would rise to the level of an actionable claim. Nor do we find any evidence of malice against Dr. Weible in the actions of Dr. Siders and USM. While certainly this situation caused distress to Dr. Weible, as the trial court noted, there was no proof it was caused by any outrageous conduct of the Defendants. The evidence shows Dr. Weible was upset about her project not working out as planned, as well as the financial failures of Mother’s Touch. However, the record shows Mother’s Touch was operating at a loss before the Defendants joined the venture. The trial court did not err in finding insufficient evidence from which a jury could find in Dr. Wei-ble’s favor on this claim.

Slander

¶43. Slander is the spoken form of the tort of defamation. Speed, 787 So.2d at 631 (¶ 21). “Defamatory communication may consist of a statement of fact” which “usually eoncern[s] the conduct or character of another.” Restatement (Second) of Torts § 565 cmt. a (1977). For a successful defamation claim, the following elements must be proven: “(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.” Simmons Law Group, P.A. v. Corp. Mgmt., Inc., 42 So.3d 511, 517 (¶ 10) (Miss.2010) (quoting Moon v. Condere Corp., 690 So.2d 1191, 1195 (Miss.1997)). Slander usually requires proof of “special harm,” which is “the loss of something having economic or pecuniary value.” Speed, 787 So.2d at 632 (¶ 25) (quoting Restatement (Second) of Torts § 575 cmt. b).
¶ 44. Dr. Weible does not specifically address the claim for slander in her brief. Accordingly, it is- procedurally barred. See Robinson v. Burton, 49 So.3d 660, 665 (¶ 16) (Miss.Ct.App.2010). Further, there was no evidence, at trial, of any false statement of fact by Dr. Siders or any other USM personnel. The claim presumably relates to a conversation in December 2003, when Dr. Siders telephoned Daniels, Human Resource Director at Forrest General, about concerns on whether or not Mother’s Touch should accept children with the flu. In response to Dr. Siders’s motion for a directed verdict, Dr. Weible merely argued that Dr. Siders’s asking Daniels questions regarding that issue “had to create a defamatory environment that should entitle [her] to relief.” The trial court correctly determined that it did not. Additionally, Dr. Weible admitted on the witness stand that there was no evidence that anyone at Forrest General took *66 any adverse reaction against her because of any conversations between Dr. Siders and Daniels. The trial court did not err in finding insufficient evidence upon which a jury could find in Dr. Weible’s favor on this claim.
¶ 45. Accordingly, the grant of a directed verdict on the claims of intentional infliction of emotional distress and slander were proper.
II. MTCA Claims: Breach of Implied Contract and Unintentional Torts
¶ 46. The trial court considered Dr. Weible’s remaining claims, all under the MTCA, in a bench trial. The trial court found that while there was an implied contract between the parties, the Defendants did not breach the contract; further, the court found for the Defendants on the remaining claims of equitable and promissory estoppel, detrimental reliance, negligent misrepresentation, and negligent infliction of emotional distress.
A. Breach of Implied Contract
¶ 47. Dr. Weible argues that even if there was no express contract, USM and Dr. Siders[4] are liable based on breach of implied contract. As noted, the Mississippi Supreme Court has interpreted the MTCA as granting “immunity to the state and its political subdivisions for ‘breach of [an] implied term or condition of any warranty or contract’ ” but a limited waiver of that immunity to the extent of $500,000. Compare Stewart, 908 So.2d at 711 (¶ 38) with Miss.Code Ann. § 11-46-15. The distinction between an express and an implied contract involves “no difference in legal effect” but in the manner of manifesting assent, such as by “words or other conduct.” Restatement (Second) of Contracts, § 4 cmt. a. “[I]ntention to make a promise may be manifested in language or by ' implication from other circumstances ....” Id.
¶ 48. It is well established that in order for a contract to be binding, there must be a meeting of the minds of the contracting parties. Brooks v. Brooks, 145 Miss. 845, 111 So. 376, 376-77 (1927). At the bench trial, the trial court ruled that an implied contract existed, based upon a meeting of the minds and performance by the parties, but the Defendants did not breach the contract. While neither filed a cross-appeal, USM and Dr. Siders argue there was no implied contract as Dr. Siders had no authority to bind the state entity. We agree Dr. Siders did not have the authority to sign an express agreement for USM; however, there was no evidence she was not authorized to perform the acts from which the trial court found the existence of an implied contract. Further, an e-mail from Dr. Siders to the provost showed that when she contacted him about the “collaboration,” he told her to “carry on.” Dr. Weible contends that the jury should have been allowed to decide the issues of breach and damages. As previously discussed, issues of implied contract are within the scope of the MTCA, where the trial judge serves as finder of fact.
¶ 49. At the bench trial, the trial judge ruled as follows:
I agree the law on partial performance and implied contracts is not necessarily clear. I am of the opinion that an implied contract did exist, based on the performance of the parties that an implied contract did exist.
That given, this Court finds the defendants did not breach that contract. This Court does not find any conduct on be *67 half of the defendants that led to a breach in this contract.
The plaintiff has said any number of times that it was the dream of the plaintiff for this Mother’s Touch Day Care, and it’s a very good dream. It appears to me that once this dream was put into action and the facility was opened that it wasn’t materializing as dreamed and the plaintiff reached out to and defendants got together and were going to work together to prolong this dream and there was performance on both parties toward that, but it didn’t work out.
The details and duties were never hammered out by the parties. However, I think there was a meeting of the minds and steps taken by both parties to fulfill this dream, but the defendants didn’t breach that dream. They didn’t breach their agreement, we don’t need to go to damages. This Court doesn’t have to go any further than that.
1150. We find substantial evidence to support this determination. There was never a finalization of the exact terms of the formal agreement. While the joint daycare project for sick and well children operated, the details were never worked out on the terms of the contract. However, to the extent that there was a promise, a meeting of the minds between the parties, and that the terms of the implied contract were identifiable, the Defendants fully performed their obligations until Dr. Weible locked them out of the daycare in January 2004, and the joint project abruptly ceased. We find no error in the trial court’s dismissal of Dr. Weible’s claim for breach of implied contract.
B. Equitable Estoppel, Promissory Estoppel, and Detrimental Reliance
¶ 51. As alternative bases of recovery, Dr. Weible argues that she is entitled to relief under the doctrines of equitable es-toppel, promissory estoppel, and detrimental reliance; thus, it was error for the trial court to dismiss these claims.
¶ 52. In Mississippi, “Equitable estoppel requires that parties seeking equity present evidence that (1) they believed and relied on some representation, (2) they changed their position as a result of that belief or reliance, and (3) there is some detriment or prejudice resulting from the reliance.” Town of Florence v. Sea Lands, Ltd., 759 So.2d 1221, 1229 (¶ 29) (Miss.2000) (citing Suggs v. Town of Caledonia, 470 So.2d 1055, 1057 (Miss.1985)). Equitable estoppel “prevents a party from embracing the benefits of a contract while simultaneously trying to avoid its burdens.” Cmty. Bank of Miss. v. Stuckey, 52 So.3d 1179, 1183 (¶ 25) (Miss.2010). “Promissory estoppel differs from equitable estoppel ⅛ that the representation is promissory rather than as to an existing fact.’ ” Suddith v. Univ. of S. Miss., 977 So.2d 1158, 1180 (¶52) (Miss.Ct.App.2007) (quoting Old Equity Life Ins. Co. v. Jones, 217 So.2d 648, 652 (Miss.1969)). The doctrine of promissory estop-pel “may arise from the making of a promise, even though without consideration, if it was intended that the promise should be relied upon and in fact it was relied upon, and if a refusal to enforce it would be virtually to sanction the perpetuation of fraud or would result in other injustice.” C.E. Frazier Constr. Co. v. Campbell Roofing and Metal Works Inc., 373 So.2d 1036, 1038 (Miss.1979) (citation omitted). “Detrimental reliance is an element of both equitable and promissory estoppel.” 4 Am.Jur.2d Proof of Facts § 641, 1 (1975).
¶ 53. These doctrines are means by which a party may be precluded from asserting contract defenses such as lack of consideration or the statute of frauds. See Thompson v. First Am. Nat’l *68 Bank, 19 So.3d 784, 788 (¶¶ 17-19) (Miss.Ct.App.2009). In the instant case, however, the trial court found there to be an implied contract that the Defendants did not breach. While the trial judge did not make specific findings of fact on the theories of equitable estoppel, promissory es-toppel, and detrimental reliance, “this Court will assume that the issue was decided consistent with the judgment and these findings will not be disturbed on appeal unless manifestly wrong or clearly erroneous.” Par Indus., Inc. v. Target Container Co., 708 So.2d 44, 47 (¶ 4) (Miss.1998) (citing Sweet Home Water & Sewer Ass’n v. Lexington, 613 So.2d 864, 872 (Miss.1993)). The trial court implicitly found, to the extent there were promises or representations, the Defendants did not breach them. In Suddith, we recognized that the doctrine of promissory estoppel does not prevent a party who has made a representation “from changing his intention in the future.” Suddith, 977 So.2d at 1181 (¶ 54) (quoting S. Mortgage Co. v. O’Dom, 699 F.Supp. 1227, 1230 (S.D.Miss.1988)).[5]
¶ 54. We find no error in the trial court’s dismissal of these alternative theories of recovery.
C. Unintentional Torts
¶ 55. Dr. Weible argues the trial court erred in dismissing her remaining unintentional tort claims, which would include negligent misrepresentation and negligent infliction of emotional distress. She states the record is replete with evidence in support of these claims.

Negligent Misrepresentation

¶ 56. To succeed on a claim for negligent misrepresentation, the plaintiff must prove the following elements by a preponderance of the evidence: “(1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance.” Holland v. Peoples Bank & Trust Co., 3 So.3d 94, 101 (¶15) (Miss.2008) (quoting Hazlehurst Lumber Co. v. Miss. Forestry Comm’n, 983 So.2d 309, 313 (¶ 11) (Miss.2008)).
¶ 57. Dr. Weible argues there is a pri-ma facie case for this claim because USM represented it would provide services, support, and labor to Mother’s Touch, and it would continue all such support into the future, but it did not. While the trial judge did not make specific findings of fact, as stated earlier, “this Court will assume that the issue was decided consistent with the judgment.” Par Indus., 708 So.2d at 47 (¶ 4). From this record, the trial judge may well have found that USM and Dr. Siders provided the represented support until, as the trial judge noted, Dr. Weible decided to change the locks on the facility and close it. We cannot find that the trial court erred in dismissing this claim.

*69
Negligent Infliction of Emotional Distress

¶ 58. The Mississippi Supreme Court “has been clear in holding that a plaintiff asserting a claim for mental anguish, whether as a result of simple negligence or an intentional tort, must always prove that the emotional distress was a reasonably foreseeable result of the defendant’s conduct.” Morgan v. Greenwaldt, 786 So.2d 1037, 1044 (¶ 23) (Miss.2001). In this case, the trial judge found: “As to the emotional distress ... I can imagine that there was distress in realizing that a dream wasn’t going to be fulfilled, that it wasn’t going to work out as planned, but I don’t see where these defendants caused that distress.” After reviewing the record, we agree that the trial judge’s factual finding of no causation is supported by the record.
CONCLUSION
¶ 59. The trial court properly granted a directed verdict for the non-MTCA claims of breach of express contract, slander, and intentional infliction of emotional distress. As to the MTCA claims, while the trial judge found an implied contract existed between the parties, he concluded the Defendants did not breach the implied contract and properly dismissed the claims for breach of implied contract, equitable and promissory estoppel, detrimental reliance, negligent misrepresentation, and negligent infliction of emotional distress. Accordingly, we affirm the trial court’s judgment.
¶ 60. THE JUDGMENT OF THE CIRCUIT COURT OF FORREST COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ. ISHEE, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR. MYERS, J., NOT PARTICIPATING.

. The University Center for Excellence in Developmental Disability Research, Education, and Service for the state of Mississippi is *56 USM’s Institute for Disability Studies, http://www.usm.edu/ids/.

. We note including the Defendants’ exhibits, there were 129 exhibits entered into evidence at trial.

. Board approval is required prior to execution of purchase contracts for all land acquisitions that exceed $100,000; all leases, easements, oil and mineral leases, and timber sales; all other land, personal property, and service requests that require an aggregate total expenditure of more than $250,000; bookstore, food service, or athletic concession contracts projected to generate aggregate total revenue of more than $250,000 or if the term of the contract exceeds four years. Institutions of Higher Learning Bylaw 707.01.

. Dr. Siders claims any implied contract claim would be between USM and Dr. Weible only.

. The Defendants contend that the state cannot be estopped "where the acts of their officers were unauthorized” or beyond their authority, citing Rawls Springs Utility District v. Novak, 765 So.2d 1288, 1292 (Miss.2000). We note, however, that the state can be es-topped by the acts of its authorized agents. See Mayor & Bd. of Aldennen, City of Clinton v. Welch, 888 So.2d 416, 424-27 (¶¶ 43-52) (Miss.2004). As previously noted, while Dr. Siders had no authorization to sign an express contract, no one has contended she performed any act that she was not authorized to do.