ROBERTS, J.,
 

 for the court.
 

 ¶ 1. On October 2, 1992, Walter F. Gan-dy and Charles H. Gandy (collectively, the Gandys) acquired George Ford’s real and personal property for $14,000. Ford retained a life estate in both the real and personal property. In the transaction, Walter and Charles obtained twenty-six acres, which are located near the Pearl River in Marion County, Mississippi; sixteen guns; a tractor; various farm equipment; vehicles; and much more. The testimonies of numerous witnesses established that Ford, an eccentric and elderly man, was also a heavy drinker. Utilizing the $14,000 paid by the Gandys along with several thousand dollars of his own, Ford purchased a new tractor in 1993. The Gandys claim to have acquired ownership in the new tractor that same year. On August 15, 2000, Ford sold the new tractor to David Eisworth’s stepson, Chris Hitt. On September 8, 2000, Walter and Charles filed a complaint in the Marion County Chancery Court against Ford and Eisworth (collectively, the defendants) seeking an equitable lien against the new tractor and alleging waste. On May 3, 2001, an amended complaint was filed wherein First Federal Bank For Savings and Hitt (collectively, the defendants) were joined.
 
 [1]
 
 The defendants counterclaimed seeking to have the deed to the real property set aside, and both parties claimed that there was undue influence exerted over Ford in the transactions. Ford died subsequent to the trial but pri- or to the chancellor’s ruling. His estate is the party representing his interest.
 

 ¶ 2. Based upon the evidence presented at trial, the chancellor determined that Ford had not intended to convey the new tractor, nor had there been adequate consideration paid for the new tractor. On December 6, 2007, the chancellor rendered a judgment against the Gandys finding that, although they had good title to the real property, the 1993 bill of sale executed for the new tractor was void, set aside, and held for naught. The record is silent as to why the chancellor’s judgment was rendered three years after the hearing. Aggrieved by that decision, the Gandys now appeal and raise one issue: Whether the chancellor committed manifest error and abused his discretion in setting aside a bill of sale that was clear and unambiguous. Finding no error, we affirm.
 

 FACTS
 

 ¶ 3. At the time of trial, Ford was about five months shy of his eighty-fourth birth
 
 *192
 
 day. Many of the witnesses referred to Ford as “Uncle George.” He was related to Walter and Charles by marriage. Ford and Walter’s wife were first cousins. The record does not indicate that Ford ever married or had any children, and the testimony revealed that he was rather eccentric and lived a meager life. However, Ford’s propensity to avoid the finer things of life did not prevent him from acquiring a fair amount of assets. The properties that the Gandys acquired from Ford were not insignificant, and the testimony revealed that Ford, who apparently avoided banks, carried around coffee cans that contained approximately sixty to seventy thousand dollars of Ford’s money.
 

 ¶ 4. It is undisputed that Ford required the assistance of his family throughout the years, and he began experiencing serious health problems in the late 1980s and early 1990s. At various times, Ford lived with Walter’s family or in Walter’s hunting camp. Ford also lived with various family members at different times. Barbara Eis-worth, who is the wife of the defendant Eisworth and the mother of the defendant Hitt, testified that Ford had lived with her and her mother and father for many years. Eventually, Walter and other family members helped to build a small home for Ford on property that Ford inherited from his father. Curiously, Ford would not allow the construction of an indoor bathroom, even though the fixtures were purchased. This, along with many other peculiarities such as Ford often having “hollering” episodes, his spitting Copenhagen tobacco on the walls and the floor, and his allowing garbage and bags of human waste to accumulate around the house, confirms either that Ford was indeed quite eccentric, or the effects of his daily alcohol consumption were, at best, adverse to his mental and physical well-being. Ford suffered a stroke in the mid to late 1990s, and Barbara took care of many of Ford’s physical needs, as well as being appointed as Ford’s conservator.
 
 [2]
 

 ¶ 5. Practically every witness testified about Ford’s propensity to drink heavily, and their testimonies were confirmed by Ford himself. Ford’s alcoholic beverage of choice was beer, and according to Ford’s own testimony, he drank “continuously for years and years and years.” Ford’s mental faculties and tendency to drink heavily were discussed at trial regarding Ford’s intent and competence to convey his interest in his land, the old model 3910 tractor, and the new tractor. However, the testimonies presented by the witnesses did not reveal whether Ford was drinking at the time he entered into any of the transactions at issue. Rather than provide an exhaustive account of the facts surrounding the events in this section of the opinion, we will weave the relevant facts into the discussion of applicable case law.
 

 STANDARD OF REVIEW
 

 ¶ 6. “The existence of a contract and its terms are questions of fact to be resolved by the fact-finder, whether a jury or a judge in a bench-trial.”
 
 Anderson v. Kimbrough,
 
 741 So.2d 1041, 1045(¶ 12) (Miss.Ct.App.1999) (citation omitted). “This Court will not disturb the factual findings of a chancellor when supported by substantial evidence unless we can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard.”
 
 White v. Cooke, 4
 
 So.3d 330, 333(¶ 12) (Miss.2009) (citation and internal quotation omitted). “Ques
 
 *193
 
 tions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact-finder. The standard of review for questions of law is de novo.”
 
 G.B. “Boots” Smith Corp. v. Cobb,
 
 860 So.2d 774, 777(¶6) (Miss.2003) (internal citations omitted).
 

 DISCUSSION
 

 ¶ 7. This case involves four transactions, in which Ford participated, in some capacity. In an attempt to avoid confusion, we will address them in the order that they transpired. Ford entered into a transaction with Walter and Charles on October 2, 1992. This was the first transaction at issue in this case. On that date, Ford signed a warranty deed and a bill of sale in favor of the Gandys. The warranty deed transferred ownership of twenty-six acres of land located in Marion County, Mississippi, and a separate bill of sale conveyed the following items:
 

 1 10 Gauge 2 barrel shotgun serial # 2G60G;
 

 1 Remington 870 12 gauge shotgun serial # V073142V;
 

 1 Remington 12 gauge shotgun serial # 469225;
 

 1 Remington rifle 121-22 serial # 155752 (.22 WRF);
 

 1 Winchester shotgun model 12-20 gauge serial #151429;
 

 1 M-l 30 caliber rifle serial # 402600;
 

 1 Remington 870 shotgun 410 gauge serial # S 20361H;
 

 1 Savage model 99 rifle (.300) serial # 27777;
 

 1 Springfield model 1903 rifle serial # 1406341;
 

 1 Remington model 552 rifle serial # 1579816;
 

 1 Smith & Wesson model 14 pistol serial # K 395562C38);
 

 1 Smith & Wesson model 29-3 pistol serial # N 893488 (.44 Mag.);
 

 1 Smith & Wesson model 25-5 pistol serial
 
 #
 
 N 763225 (Colt .45);
 

 1 Remington model 1100 12 gauge mag. shotgun;
 

 1 Remington 22 pump rifle;
 

 1 Bridge Gun Co. 20 gauge shotgun serial # 805059;
 

 1 Job Master tool box containing assorted tools & ammunition;
 

 1 Johnson 7.5 HP outboard motor model # J8RCNR serial # B5585027;
 

 1 Western Auto freezer model # FRM2715B-88 serial # 118C254205;
 

 1 Ford Pick-up truck serial # F15HUCE9058;
 

 1 Ford tractor (3910) CA 454C 8B22 BB 48221;
 

 1 Woods Dixie Cutter bush hog model M5;
 

 1 Herd Sure Feed spreader MOD 3-PT-F-160;
 

 1 Covington planter serial # 230800-230788;
 

 1 Tufline disc model # THF serial # C3;
 

 1 Taylor-Way cultivator model # 1461-4 serial #1009493;
 

 1 Hand pump (fuel) Tuthill Corp. series 5200;
 

 1 Outbuilding (van body) containing various tools and ammunition, etc.;
 

 1 14 foot Dura Craft aluminum boat serial # 35225;
 

 2 24" log tongs;
 

 1 Peavy hook;
 

 3 Homelite chain saws
 

 “The elements of a valid contract are: (1) two or more contracting parties; (2) consideration; (3) an agreement that is sufficiently definite; (4) parties with the legal capacity to make a contract; (5) mutual assent; and (6) no legal prohibition precluding contract formation.”
 
 Mauldin Co. v. Lee Tractor Co. of Miss., Inc.,
 
 920 So.2d 513, 516(¶ 11) (Miss.Ct.App.2006) (citation omitted).
 

 ¶ 8. Indisputably, the first element of a valid contract was met. The warranty deed and the bill of sale reflect the signatures of Ford and the Gandys, thereby meeting the requirement of two or more contracting parties. Although there was discussion during the hearing about the value of both the real and personal property and whether Walter and Charles gave a fair price for the items listed above, neither party presented evidence of the value of the property at the time the land and personal property were conveyed. The chancellor declined to address whether the consideration was fair and stated that: “there was no showing of what the value of the land would have been in 1992 [so] the consideration received voluntarily by Ford must be seen as adequate for that transfer at that time.”
 

 ¶ 9. We disagree with the Gandys that an analysis of whether there has been adequate consideration paid is normally relegated to constitutional concerns related to leases of sixteenth section land. However, the supreme court has held that in the absence of fraud or undue influence, it normally will not question whether the consideration accepted by a grantor is sufficient. It is well-settled law that:
 

 
 *194
 
 Mere inadequacy of price is not sufficient to set aside a contract, unless it is so gross as to furnish evidence of fraud. There must be an inequality so strong, gross, and manifest, that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it.
 

 Standard Lumber & Mfg. Co. v. Deposit Guar. Bank & Trust Co.,
 
 169 Miss. 120, 129, 152 So. 639, 641 (1934) (citation omitted). There was consideration paid, and the terms of the contract were sufficiently definite. Therefore, elements two and three recited in
 
 Mauldin
 
 were met.
 

 ¶ 10. Although we have reservations about the competency of Ford, due to his age, health condition, habitual drinking, and eccentricities, he was not adjudicated incompetent, nor did the chancellor find him to be incompetent. The chancellor stated in his judgment that “[ajlthough there may have been times due to his drinking or medical problems he was not of capacity to enter into a legal transaction[,] a general incapacity was not shown.” Both sides raised the issue of undue influence at trial, but the chancellor made no determination on those assertions. “While this court has a duty to prevent a conveyance that was a product of undue influence, it has an equal duty to uphold the intent of a person who is now deceased.”
 
 Lancaster v. Boyd,
 
 927 So.2d 756, 760-61(¶ 18) (Miss.Ct.App.2006). The chancellor determined that Ford intended to enter into the 1992 transaction, and “[wjhere there is substantial evidence to support the findings of the chancellor, we are without authority to disturb his conclusions, even though as an original matter, [w]e might have found otherwise.”
 
 In re Estate of Harris v. Bradley,
 
 539 So.2d 1040, 1043 (Miss.1989) (citation omitted).
 

 ¶ 11. Although Ford appeared to be somewhat confused at the hearing and had difficulty hearing, Ford testified that he remembered selling the property to Walter, and he remembered receiving $14,000 from Walter. Ford testified that he told Walter, at the time of the transaction, that it was not enough for the property, and he testified that he did not intend for the old tractor to be included in the sale. At trial, Ford lamented that “he would just have to live with it and die with it.” Ford also remembered Garland Upton, the lawyer that accompanied Walter to Ford’s home in order to notarize the 1992 warranty deed and bill of sale. In addition to Ford remembering that he received $14,000 from Walter, the record contains a separate receipt, signed by Ford, which bears the same date as the warranty deed and bill of sale. The receipt recites that Ford received $14,000 cash from the Gandys for the twenty-six acres of land and the above-stated personal property, which was listed on the bill of sale. Accordingly, we find that there was sufficient evidence to warrant the chancellor’s findings that Ford was competent at the time he executed the 1992 warranty deed and bill of sale. Given that Ford was of legal age, both contracting parties remembered agreeing to the sale, and there were no legal prohibitions against Ford being able to sell his property, the remaining elements set forth in
 
 Mauldin
 
 were met. However, it is not evident that the two subsequent transactions met all of the requirements set forth in
 
 Mauldin.
 

 ¶ 12. The next transaction at issue between Ford and the Gandys was the execution of a bill of sale for the old model 3910 tractor. Walter testified that, after the transfer of ownership of the old model 3910 tractor in 1992, Ford desired to purchase a new tractor. Walter testified that he paid Ford an additional $7,500 dollars, which represented the trade-in value of the old model 3910 tractor. Walter argues
 
 *195
 
 that the agreement between him and Ford concerning the old tractor and the newly purchased tractor was as follows: after Ford purchased the new tractor, Ford would then convey title to the new tractor to Walter and Charles to replace the old tractor, for which they had given him the $7,500. Walter testified that Ford was then to retain a life estate in the new tractor.
 

 1113. Indeed, there was a bill of sale executed by Ford on March 15, 1993, which conveyed the old model 3910 tractor to Walter and Charles. The March 15, 1992 bill of sale does not provide for a life estate in Ford, as did the bill of sale executed on October 2, 1992, wherein Walter and Charles acquired the old model 3910 tractor along with the rifles and equipment stated above. There was much dispute at trial over whether Walter actually paid Ford an additional $7,500, but we state no opinion on whether Walter did or did not pay the $7,500. The bill of sale states the following:
 

 FOR AND IN CONSIDERATION of Seventy Five Hundred and NO/100 Dollars ($7,500), cash in hand the receipt of which is hereby acknowledged, I, GEORGE EDWARD FORD, hereby sell and convey to CHARLES H. GAN-DY and WALTER F. GANDY the following described farm equipment, to wit:
 

 One Ford Tractor (Model Number 3910) CA 454C 8B22 48221
 

 One Tufline Disc (Model Number THF) (Serial Number C31)
 

 The bill of sale was signed by Ford and dated March 15,1993.
 

 ¶ 14. It is curious to us why neither party asked Ford if he had received the additional $7,500 from Walter, but conspicuously, there is no separate receipt signed by Ford, unlike in both the first transaction between Walter, Charles, and Ford and in the transaction between Ford and Hitt. Both Walter and Hitt testified that Ford would only accept cash. Walter admitted at trial that there was no receipt for the $7,500, nor was there a canceled check or other document submitted into evidence, which would bolster his testimony that he had actually transferred an additional $7,500 cash to Ford. Along with Walter’s testimony, Charles admitted that there was no proof that Ford had been given an additional $7,500. No life estate was retained by Ford in the March 15, 1993, bill of sale. The March 15, 1993, bill of sale transferred the outright ownership and possession of the “old” tractor to the Gandys. This fact is crucial to our analysis.
 

 ¶ 15. The next transaction between the Gandys and Ford occurred on March 31, 1993. Utilizing the $14,000 that was paid by Walter and adding three or four thousand dollars of his own money, Ford purchased a new tractor, model number 3930. A bill of sale dated March 31, 1993, indicates that Ford transferred ownership of the new tractor along with a disc to Walter and Charles for the sum of ten dollars. The March 31, 1993, bill of sale recites that Ford retained a life estate in the new tractor. “Where the instrument in controversy contains a statement or recital of Consideration, it creates a rebutta-ble presumption that consideration actually existed.”
 
 Lancaster,
 
 927 So.2d at 761(¶ 24) (citing
 
 Daniel v. Snowdoun Ass’n.,
 
 513 So.2d 946, 950 (Miss.1987)). But, “[t]he rebuttal must be made by a clear preponderance of the evidence.”
 
 Id.
 
 No testimony supports that Walter actually paid the nominal sum of ten dollars for this conveyance. Furthermore, the chancellor had before him a report by a guardian ad litem, who had been appointed for Ford. The chancellor had appointed Forrest Dantin as guardian ad litem for Ford, and in his report to the chancellor dated
 
 *196
 
 June 25, 2001, Dantin stated that Ford knew nothing about the 1993 bill of sale that conveyed the new tractor to the Gan-dys. He also informed the chancellor that he had located the notary who had signed the March 31, 1993, bill of sale, and she had no recollection of Ford or of the transaction, although she did know Walter. The chancellor did not address the possibility of fraudulent behavior by Walter. Therefore, we decline to opine about that possibility. “It is well-settled doctrine that in all cases the presumption of evidence is in favor of honesty.... Fraud is not presumed, but it must be distinctly and satisfactorily proved, either directly or by facts or circumstances from which it may reasonably be inferred.”
 
 In re Estate of Kennington,
 
 204 So.2d 444, 448 (Miss.1967) (internal citations and quotations omitted).
 

 ¶ 16. The chancellor found that “there was no showing of consideration for the 1993 tractor transfer and that, coupled with the testimony of Ford that he only intended to transfer the land, [the Court finds] that the 1993 Bill of Sale of the tractor to [Gandys] [is] void.” The chancellor went on to state, “[i]t would not seem logical nor the action of a competent man to take the money from the sale of land, purchase another tractor and intend for the [new] tractor to be a part of the same value for the purchase of the land.” The chancellor found that it “was not Ford’s intent nor did the 1993 Bill of Sale have adequate' consideration based on the evidence presented.” We agree. Indeed, it would seem illogical for any person to sell twenty-six acres of land, his old tractor, and virtually everything he owned for $14,000; then for that person to take the $14,000 and add three to four thousand more dollars of his own money and purchase a new tractor worth $17,000 to $18,000; and finally, for that person to convey ownership of the new tractor to the same individual that had just acquired the old tractor for the same $14,000.
 

 ¶ 17. The Gandys cite
 
 Palmere v. Curtis,
 
 789 So.2d 126, 131(¶ 10) (Miss.Ct.App.2001) in their brief to this Court and argue, “[w]hen a contract is clear and unambiguous, this Court is not concerned with what the parties may have meant or intended but rather what they said, for the language employed in a contract is the surest guide to what was intended.” (Citation omitted). The Gandys further argue that the bills of sale are clear and unambiguous and were notarized by an independent party.
 
 [3]
 
 We agree, but we remind the Gandys that the truth which they have recited is applicable to them as well. Recognizing that the language in the March 15th and March 31st bills of sale is unambiguous, we determine the Gandys did no more than acquire outright ownership of the old tractor, with no life estate retained in Ford. In other words, the March 15, 1993, bill of sale simply indicates that Walter and Charles purchased Ford’s life estate, which Ford had retained in the October 2, 1992, bill of sale. This was further supported by Walter’s testimony that, after the March 15, 1993, transaction, he took possession of the old tractor and transported it to his property in Picayune, Mississippi.
 

 ¶ 18. The Gandys correctly recognized the following:
 

 
 *197
 
 When this Court interprets a contract, we look to the contract for its meaning, not what a party thereto may have thought it meant. The standard is objective, measured by the language of the contract, not by the subjective intent or belief of a party which conflicts with [the] meaning ascertained by the objective standard.
 

 Id.
 
 (citation and quotation omitted). Ford testified that when he sold the land to Walter and Charles on October 2, 1992, he sold the land “in good faith,” and it was “supposed to be [only] the land.” Furthermore, there was no testimony given by Ford that he ever intended to transfer ownership of his new tractor to Walter and Charles, nor that he intended to “swap” the titles between the old and new tractor. Any subjective intent by Walter and Charles that the March 15, 1993, bill of sale and alleged payment of $7,500 was to secure their ownership interest in the new tractor is unavailing. A plain reading of the document reveals that the March 15, 1993 bill of sale merely transferred outright ownership of the old model 3910 tractor to Walter and Charles without Ford retaining a life estate.
 

 ¶ 19. Although the language may have been unambiguous in the March 31, 1993, bill of sale for the new tractor, the record is devoid of any testimony or evidence that Ford received any consideration whatsoever, not even the nominal sum of ten dollars recited in the bill of sale. Based upon that fact, we find that the chancellor was correct in finding that Ford did not receive any consideration for the sale of his new tractor to the Gandys. Consideration is crucial to the formation of a contract, and the lack of any consideration coupled with the lack of intent on Ford’s part, mandates our affirmance of the chancellor’s judgment that the March 31, 1993, bill of sale did not result in a valid contract. The record fully supports that there was no consideration paid to Ford for the new tractor, nor was there mutual assent between the parties. These two elements are essential for a valid contract. Therefore, we conclude that there exists substantial evidence in the record to support the chancellor’s conclusion setting aside the March 31, 1993, bill of sale of the new tractor to the Gandys.
 

 ¶ 20. The catalyst for the instant case was Ford’s sale of the new tractor to Hitt in 2000. Because of their belief that they held ownership in the new tractor, Walter and Charles brought suit against Ford, Eisworth, Hitt, and First Federal Bank for Savings seeking an equitable lien in the new tractor and alleging waste. We find their argument is without merit, and affirm the chancellor’s holding that Hitt was a bona fide purchaser for value.
 
 [4]
 

 ¶ 21. To be a bona fide purchaser, one must prove that he paid a valuable consideration for the property without notice of any other claims to the property.
 
 See Stevens v. Hill,
 
 236 So.2d 430, 434 (Miss.1970) (citation omitted). Testimony by both Hitt’s mother, Barbara, and Ford revealed that Ford told her that he wanted to sell the new tractor, so she asked her husband, Eisworth, if he wanted to purchase the tractor. Eisworth declined because he did not need a tractor that size, but he instructed her to ask their
 
 *198
 
 son, Hitt, if he would be interested. After contemplating the purchase for a few days, Hitt flew home from the Bahamas, where he was working, and arranged the financing for the tractor. Just as Ford had required Walter to pay him in cash when the October 2, 1992, transaction was executed, Ford would only accept cash from Hitt. Barbara had her daughter cash Hitt’s check in the amount of $7,000 on August 9, 2000, and she then took $7,000 to Ford. The record contains financing documents which indicate that the security for the loan procured by Hitt was for Ford’s new 1993 Ford 3930 tractor. Additionally, there is a bill of sale indicating that Hitt purchased the 1993 model 3930 tractor, as well as a receipt signed by Ford stating that he received $7,000 from Hitt on August 15, 2000. The most convincing evidence is Ford’s testimony that he “remembered getting $7,000 for [the tractor]” from Hitt. “A valuable consideration is paid by one who, at the time of his purchase, advances a new consideration, surrenders some security, or does some other act which, if his purchase were set aside, would leave him in a worse position than that which he occupied before the purchase.”
 
 Buckley v. Garner,
 
 935 So.2d 1030, 1032(¶ 8) (Miss.Ct.App.2005) (citation omitted). The record contains ample evidence to support the chancellor’s finding that Hitt paid valuable consideration to Ford for the new tractor. Furthermore, the record supports a finding that Hitt paid value for the new tractor without notice of any claim of ownership by Walter and Charles.
 

 ¶ 22. Barbara testified that neither she, Eisworth, nor Hitt had heard anything about Walter and Charles claiming to own Ford’s new tractor. She testified that she and her family were aware of the land ownership through “the family grapevine,” but “[t]hat was all to [her] knowledge that [Walter] had of [Ford’s].” Even if Hitt did not have actual notice, he may have been accountable for inquiry notice. “One chargeable with inquiry notice is chargeable with notice, equivalent in law to knowledge, of all those further relevant facts which such inquiry, if pursued with reasonable diligence, would have disclosed.”
 
 Id.
 
 at 1033(¶ 10) (citation and quotation omitted).
 

 ¶ 23. We find that the record supports the chancellor’s determination that Hitt did not have actual or inquiry notice. First, the transactions and events that transpired between the Gandys and Ford were transacted in the privacy of Ford’s home, without any other family member or friend in attendance, and there was no testimony by Walter or Charles that either of them had told Hitt, or anyone else, that they claimed ownership of the new tractor prior to Hitt acquiring it from Ford. Second, it was the old tractor that was kept at Walter and Charles’s property in Picayune, Mississippi, and the new tractor was kept at Ford’s home. The most convincing testimony regarding any notice to Hitt was Ford’s testimony.
 

 ¶ 24. Ford testified that he remembered selling the new tractor to Hitt; he stated that he had two tractors and had sold one to Walter and one to Hitt. Ford further testified that Hitt had not asked him to sell it, but Eisworth had been looking for one. Therefore, Ford told Eis-worth that he had one that he would sell him. As stated, Eisworth did not desire to purchase Ford’s tractor, so he had his wife tell Hitt about it. Nothing in Ford’s testimony reveals that he indicated to Eis-worth, Barbara, or Hitt that he had previously sold the new tractor to Walter and Charles. We find the evidence supports the chancellor’s acceptance of Hitt’s testimony that he did not have notice of any claim against the new tractor. Furthermore, we find that notice by Hitt is irrele
 
 *199
 
 vant based upon the chancellor’s finding that Walter and Charles did not have any ownership interest in the new tractor. This issue is without merit.
 

 CONCLUSION
 

 ¶ 25. It is evident from the hearing transcript and the record that Ford was an individual adversely affected by advanced age, ill health, and chronic drinking. However, he clearly remembered the transactions where, it is beyond dispute, he received compensation for the conveyance of his property. No separate receipt signed by Ford was submitted that proved the Gandys had paid Ford an additional $7,500 for the March 15,1993, transaction, wherein the Gandys took outright ownership and possession of the old tractor, nor was there any testimony or evidence that the Gandys paid Ford the paltry sum of ten dollars for the March 31, 1993, conveyance. Therefore, we find that the chancellor did not err in determining that no consideration was paid for the March 31, 1993, conveyance of the new tractor. Although the Gandys would have this Court connect the March 15, 1993, bill of sale to the new tractor, we, as the chancellor, decline to do so. The March 15, 1993, bill of sale was clear and unambiguous and vested in the Gandys’ complete ownership and present possession of the old model 3910 tractor. The chancellor did not err in refusing to accept the subjective, and possibly secret intentions, of the Gandys. Accordingly, we do not find that the chancellor’s ruling was manifestly wrong or that a clearly erroneous legal standard was applied. Accordingly, we affirm the chancellor’s judgment.
 

 ¶ 26. THE JUDGMENT OF THE CHANCERY COURT OF MARION COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE AND MAXWELL, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., NOT PARTICIPATING.
 

 [1]
 

 . The only complaint contained in the record is the one filed on September 8, 2000. The Appellees’ brief outlines the amended complaint and some other proceedings, but since we do not have copies of those documents and do not find them relevant to the analysis of this case, we will not discuss other procedural matters surrounding the hearing that was held on May 13, 2004. The Appellees' brief to this Court indicates that First Federal Bank for Savings filed an answer, and a default judgment was entered against the Gan-dys in favor of the bank, with the bank being awarded its attorney’s fees. There are no court documents in the record to verify this, but it is undisputed by the Gandys.
 

 [2]
 

 . It is somewhat unclear, but the testimony indicates that Ford had suffered some sort of illness around the late 1980s or early 1990s. However, the most severe health incident seems to have occurred in the mid 1990s.
 

 [3]
 

 . We take notice of the fact that Ford was not represented by counsel in any of the transactions that transpired between Ford and Walter and Charles. Ford testified that he was not a participant in the drafting of the documents. He also testified that the money for the October 2, 1992, transaction “was [exchanged] before [the warranty deed and bill of sale were] written up." If any ambiguity were to exist, it would be construed against Walter and Charles.
 

 [4]
 

 . Although the chancellor did not specifically refer to Hitt as a bona fide purchaser for value, he did not disturb Hitt's ownership in the new tractor, and he acknowledged Hitt's testimony about acquiring the tractor without any notice of Walter’s and Charles’s claims against the property. The chancellor also found the financing documents executed by Hitt for the new tractor were evidence of consideration given by Hitt for the new tractor.