# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00520-COA

IN THE MATTER OF THE LAST WILL AND TESTAMENT OF DAN A. McINTOSH IV, DECEASED: BEVERLY QUICK, EXECUTRIX                                   APPELLANT

v.

DAN A. McINTOSH III                                                    APPELLEE

DATE OF JUDGMENT:              03/19/2018
TRIAL JUDGE:                  HON. WILLIAM R. BARNETT
COURT FROM WHICH APPEALED:    COVINGTON COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:      MICHAEL CLAYTON BAREFIELD
                              WILLIAM H. JONES
ATTORNEY FOR APPELLEE:        DAN A. McINTOSH III (PRO SE)
NATURE OF THE CASE:           WILLS, TRUSTS, AND ESTATES
DISPOSITION:                  AFFIRMED - 10/22/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### EN BANC.

### WESTBROOKS, J., FOR THE COURT:

¶1.    This appeal arises from a dispute over a vast collection of guns, ammunition, and shooting accessories (gun collection) transferred from Dan McIntosh IV (Mac) to his father, Dan McIntosh III (Dan), through a bill of sale. After Mac's death, his mother, Beverly Quick, was named executrix of his estate. On May 26, 2016, Beverly filed a motion to compel the return of the gun collection to the estate. Dan refused and argued that the bill of sale had transferred ownership of the gun collection from Mac to him. The chancellor agreed and found the bill of sale was binding and left the gun collection in Dan's possession. Aggrieved,

Beverly appealed.[1] The record is devoid of a rebuttal made by a clear preponderance of the evidence that the transaction between Dan and Mac was an invalid or inadequate bill of sale. For the reasons outlined below, we affirm as the chancellor's ruling is not manifestly wrong or in error.

**FACTS**

¶2.     Mac died on December 28, 2015. His mother, Beverly Quick, filed a petition for to probate Mac's will on March 14, 2016. On August 19, 2016, Beverly was named executrix, and the chancellor ordered that all of Mac's personal property be returned to the estate. Beverly claims that the gun collection conveyed to Dan is a part of Mac's estate.

¶3.     There are no winners in this case. A father, Dan, lost his son, Mac, to suicide, and from the record we deduce that he lost Mac long before he took his own life. Mac hanged himself after he was arrested for trying to kill or at least threaten Dan by (1) throwing two Molotov cocktails in Dan's windows and (2) ramming his Lexus into Dan's front porch. If that were not enough, upon his arrest, law enforcement found a loaded shotgun on the front-passenger seat of Mac's Lexus—a loaded shotgun that he had taken from Beverly's house.[2] While there was no proof that he had actually shot the gun, it can be logically inferred that it was not there as a sign of affection. Years prior to that violent day, Mac entered into an

---

[1] The Mississippi Supreme Court initially denied Beverly's appeal for lack of a final judgment in accordance with Rule 54(b) of the Mississippi Rules of Civil Procedure. The chancellor corrected his order on March 14, 2018, and Beverly filed a new notice of appeal in response to the corrected judgment.

[2] Beverly testified that she knew then that Mac could not possess a firearm.

agreement with Dan. At the center of the controversy in this case is the resulting bill of sale that was certainly and unrebuttably signed by Mac.

¶4.     Below is an image of the of the bill of sale admitted into evidence:



The bill of sale is a contract for the transfer of goods described here as the "remaining firearms and ammunition, gun safes, storage building or other shooting accessories not now held by agencies of the United State government." The document begins by stating "for good and valuable *considerations*"—plural.  (Emphasis added; uppercase and boldface omitted). The bill was signed on or about April 2, 2010, prior to dispositions of Mac's criminal cases in state and federal court.[3]

¶5.     Mac was arrested in 2006 for shooting into an occupied dwelling in Covington County. Dan exclusively represented Mac in state court. Dan also instrumentally assisted

---

[3] The signatures to the contract were not notarized and is not needed. "It is basic contract law that a contract does not have to be notarized to be valid." *Union Healthcare, Inc. v. Morgan*, 750 So. 2d 1268, 1274 (¶32) (Miss. Ct. App. 1999).

Joseph Holloman in Mac's representation in federal court.[4] Mac's federal prosecution commenced on or about January 22, 2009, over a year before the execution of the bill of sale. Mac pled guilty to a favorable resolution of the federal charges on May 5, 2010 (less than one month after the bill of sale was executed), and the judgment was signed on July 21, 2010. According to Dan, he later notified Mac that he got the state criminal charges dismissed on or about September 30, 2010. As with all federal criminal convictions, Mac was unable to have any firearms or other deadly weapons in his possession or under his control. The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) seized several of his automatic weapons. It was undisputed that Mac did not want the federal government to have access to the remainder of his gun collection.

¶6.     At the time Mac signed the bill of the sale, which was dated April 2, 2010, he had been receiving, and continued to receive, the benefit of his father's legal services, which led to Mac receiving an almost unheard-of resolution of his criminal charges.[5] Beverly testified that Mac told her that he never signed the bill of sale. Beverly was not a witness to the bill and had no other personal knowledge of its execution. Jason Graham, Mac's friend, and Laura McIntosh, Dan's wife, witnessed Mac sign the bill of sale. Further, a storage shed was

---

[4] In his brief, Dan states that Beverly had hired Holloman for assistance in the federal case, and Holloman helped Dan occasionally, including when he was negotiating a plea deal for Mac. Beverly conceded in her brief that Dan was instrumental in negotiating the plea deal for Mac.

[5] According to Dan, Mac was sent to Wiggins and then placed in a halfway house in Hattiesburg in 2010 and given probation.

built on Jason's land for the specific purpose of storing the gun collection.

¶7.    In 2014, four years after the signing of the contract and resolution of his criminal charges, Mac went to Jason's property unannounced and tried to take possession of all or part of the gun collection in order to sell them for money to Winford "Bud" May. May testified that Mac tried to retrieve the gun collection, and in response Jason told Mac that "[he knew] they are [Mac's] guns, but [Dan] said don't take them." He also testified to an altercation between Mac and Jason and then Mac and Dan. Mac left Jason's property without the gun collection. Jason later testified that he thought Dan was the owner of the guns. He also testified that in order for Mac to be released on bail in 2006, "[Jason and Dan] did not want the guns to be in [Mac's] possession or nothing else," and he stated that Mac told him he could not have anything to do with a gun again.

¶8.    In December 2015, Beverly testified that Mac called her from his home and told her he was "in the middle of [his] suicide" and that he had "one thing [he had] to do before [his] life [ended]." He also told Beverly he had waited until there was nothing she could do to prevent his suicide and told her to open up the safe inside her home. Beverly did not open the safe but admitted that her husband kept guns in their playroom inside her home. Mac, a convicted felon, then went to Beverly's home and took a pistol and a shotgun from her playroom. Beverly grabbed the pistol from his back pocket but could not get the shotgun. Mac then drove to Dan's home, threw two bombs in his window, and attempted to drive his Lexus through Dan's front door. After this attack, Mac was arrested, and he later ended his

5

life in the jail.

¶9. On August 2, 2017, a hearing was held to determine the validity of the bill of sale. In his September 9, 2017 opinion, the chancellor made eleven findings of fact:

1.  That there is no proof that Dan told Mac that he had to convey the property to him to secure or comply with a plea agreement;

2.  There is no proof that, at the time of the Bill of Sale, that Mac was suffering from the effects of mental illness or under the effects of drugs such as to prevent him from exercising his free will;

3.  Mac sought, and received, the independent, private advice of his good friend, Jason Graham, and decided thereafter to give the property to Dan;

4.  That Mac had his criminal lawyer, Joe Holloman, available for advice;

5.  That Mac thereafter entered a free and voluntary plea of guilty to the federal charge;

6.  That Mac retained no access to the property;

7.  That some of the property was sold by Dan during Mac's lifetime and Dan received the proceeds, not Mac;

8.  That Mac sold the property specifically excluded from the Bill of Sale and received the proceeds;

9.  That from April 2010, until sometime in 2014, Mac made no attempt to claim the property;

10. After he attempted to obtain possession of the property in 2014 and was rebuffed, he claimed there was no Bill of Sale, but made no further attempt, legally or otherwise, to secure the property; and

11. There was no proof that, from April 2010, until his demise in December 2015, that Mac made any allegation that the Bill of Sale was improper and took no action to challenge its execution.

6

As a matter of law, the chancellor found that the April 2010 bill of sale was valid, and in response, Beverly filed her notice of appeal.[6]

## STANDARD OF REVIEW

¶10.    "This Court employs a limited standard of review when reviewing a chancellor's decision." *Marshall Durbin Food Corp. v. Baker*, 909 So. 2d 1267, 1273 (¶13) (Miss. 2005) (citing *Shirley v. Christian Episcopal Methodist Church*, 748 So. 2d 672, 674 (¶9) (Miss. 1999)). The chancellor is the fact-finder and is charged with the obligation of resolving disputes between the parties and likewise is the sole arbiter of the credibility of the witnesses. *Estate of Volmer v. Volmer*, 832 So. 2d 615, 622 (¶21) (Miss. Ct. App. 2002). "We will not interfere with or disturb a chancellor's findings of fact unless those findings are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Marshall Durbin Food Corp.*, 909 So. 2d at 1273 (¶13). "Questions of law are reviewed de novo." *Id.*

## ANALYSIS

¶11.    Beverly argues that the bill of sale was not valid because Dan took advantage of Mac's mental illness and vulnerability. Specifically, she argues that Dan told Mac he could not own the gun collection due to the felony guilty plea, and Dan forced Mac to give the gun

---

[6] The special chancellor also acknowledged in his opinion that "while not raised it also appears that no suit of any nature concerning the Bill of Sale was filed until approximately six years from its execution and the instant claim should be barred by the statute of limitations." However, the chancellor did not dismiss the claim in his final order. As mentioned Dan did not raise the issue. When "[t]he [defendants] fail[ed] to raise the statute of limitations issue at the trial level . . . the issue is waived." *Brown v. Thomas*, 757 So. 2d 1091, 1094 (¶15) (Miss. Ct. App. 2000). The defense is not available.

7

collection to him. Additionally, Beverly argues that there was no consideration given to support the bill of sale operating as a contract, making the bill of sale invalid. However, the record before us establishes a valid contract. The record does not set the stage for considering the sale to be an inter vivos gift, and therefore we do not reach or consider the issue on appeal.

¶12. The chancellor found as a matter of law "that the April 2010, Bill of Sale from Mac to Dan was valid and that Dan became the owner of all of the items included in the Bill of Sale at that time and, further, that at the time of his demise, the assets included in the Bill of Sale were not assets of Mac's estate." There need not be any further iteration of his legal finding.

¶13. A "bill of sale" is defined as "an instrument for conveying title to personal property, absolutely or by way of security." Black's Law Dictionary (10th ed. 2014). "A transfer may be either an absolute assignment by way of gift or sale, or an assignment by way of mortgage or security only; but in either case when a written document of any sort is used to effect the transfer, the document is called technically a 'bill of sale.'" Albert Gibson, Arthur Weldon & H. Gibson Rivington, Gibson's Conveyancing 302 (14th ed. 1933). Mississippi has long recognized that "the acknowledgment of payment contained in the 'bill of sale' is merely a receipt which may be contradicted by parol evidence." *Smith v. Stevens*, 299 So. 2d 690, 691 (Miss. 1974) (citing *Fowlkes v. Lea*, 84 Miss. 509, 36 So. 1036 (1904)). A bill of sale is an instrument that is evidence of a contract. Historically the Mississippi Supreme Court has used

the two terms interchangeably. *See Mitts v. Price*, 129 Miss. 554, 163-65 (1922) (illustrating the supreme court employing the terms "bill of sale" and "contract" interchangeably in its analysis to determine the reasonable performance period under the bill of sale at issue and discussing the bill of sale as a written contract for the sale of property); *see also Hercules Powder Co. v. Westmoreland*, 249 Miss. 849, 164 So. 2d 471, 474 (1964) (using the phrase "bill of sale or contract" when finding that a valid contract of employment existed between co-defendants).

¶14.    In order to form a valid contract, the laws of this State require the following: "(1) two or more contracting parties; (2) consideration; (3) an agreement that is sufficiently definite; (4) parties with the legal capacity to make a contract; (5) mutual assent; and (6) no legal prohibition precluding contract formation." *Gandy v. Estate of Ford*, 17 So. 3d 189, 193 (¶7) (Miss. Ct. App. 2009). A valid contract has to be supported by consideration. *Id.*

> Consideration is, of course, one of the six elements required for the existence of a valid contract. The Mississippi Supreme Court has defined consideration for a promise as (a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification or destruction of a legal relation, or (d) a return promise, bargained for and given in exchange for the promise.

*Marshall Durbin Food Corp.*, 909 So. 2d at 1273 (¶14) (citation and internal quotation marks omitted).

> Where the instrument in controversy contains a statement or recital of consideration, it creates a rebuttable presumption that consideration actually existed. The general rule is that this presumption is established even by such expressions as "for value," "for good and sufficient consideration," "for value received" or, as in the present case, "for valuable consideration."

9

*Daniel v. Snowdoun Ass'n*, 513 So. 2d 946, 950 (Miss. 1987) (citations omitted). "While the presumption does not preclude the defendant from putting on proof designed to show that the consideration was not actually paid, his 'rebuttal must be made by a clear preponderance of the evidence.'" *Marshall Durbin Food Corp.*, 909 So. 2d at 1274 (¶15) (quoting *Daniel*, 513 So. 2d at 950).

¶15.     In *Daniel*, a nonprofit corporation (Snowdoun) was established in a codicil of the will of the testatrix, Elizabeth Garth, conveying the title to her childhood home to be opened as a museum. *Daniel*, 513 So. 2d at 948. Other bequeaths were made to the Mississippi University for Women and St. Paul's Episcopal Church. *Id*. The widower sued, seeking to renounce the will, take his legal share, and have the bequests to MUW and St. Paul declared void. *Id*. The nonprofit corporation was not named as a party to the will contest, and its participation in settlement negotiations was not clear. *Id*. Regardless, a settlement was reached, leaving Snowdoun with about $100,000 as a result. *Id*. Daniel also executed a memorandum of understanding (MOU) in which he agreed to set up an inter vivos trust as a depository for the money. *Id*. Snowdoun was named the beneficiary of the trust. *Id*. Daniel failed to set up the trust fund, and Snowdoun sued for specific performance. *Id*. The MOU became the subject of litigation. *Id*. The nonprofit sued Daniel for specific performance. *Id*. In response Daniel claimed the agreement failed for lack of consideration. *Id*. He claimed that he only offered encouragement and appreciation, which is not consideration. *Id* at 949. The court was left to weigh whether the MOU was supported by consideration. *Id*. The case

10

cited bedrock canons for the element of consideration in agreements: "[M]ere sentiments such as affection, love and the like, cannot in themselves furnish adequate consideration for an enforceable contract . . . considerations must come from the parties to the agreement." *Id.* at 949. Further explaining that "[c]onsideration means something which is of some value in the eye of the law, moving from the plaintiff; it may be some benefit to the defendant or some detriment to the plaintiff; but in all events it must be moving from the plaintiff." *Id.*

¶16.    While Daniel tried to claim that Snowdoun had no inducement because their interests were aligned during the settlement that led to the MOU, Snowdoun claimed that it intervened in the negotiations because of Daniel's encouragement. The Mississippi Supreme Court found that the record could support both and held it "will not overturn a chancellor's finding of fact unless he is manifestly wrong." *Id.* at 951.

¶17.    In the present case, Beverly claims that no consideration exists to support the bill of sale and is therefore invalid.  We disagree.  It is an undisputed fact that Mac did not want the federal government to have access to all or part of his gun collection. That was something of value to Mac that motivated him to contract with his father. This is one theory that supports the element of consideration in the bill of sale.

¶18.    Another theory of consideration is Dan's successful representation of Mac in his criminal matters. Mac received the benefit of the legal services which led to lenient dispositions of his dual criminal matters. Although based on different reasons, we agree with the chancellor that the bill of sale is valid evidence of a contract. The chancellor had more

11

than enough evidence not only to infer, but also definitely conclude, that there was a valid contract between father and son and also attorney and client.

¶19. Beverly's only proof is that Mac claimed he never signed the bill of sale—the same bill that was presented with Mac's signature on it. Neither Beverly nor May were present at the execution of the document. Jason witnessed the signing of the bill of sale. Jason also testified that he thought Dan was the owner of the gun collection. Jason continued to testify that in order for Mac to be released on bail, "they did not want the guns to be in his possession or nothing else." He also concluded his testimony by saying that Mac told him he could not have anything to do with a gun again.

¶20. Beverly made no rebuttal by a clear preponderance of the evidence that the bill of sale was invalid or that anything other than an enforceable contract existed between Dan and Mac. Mac accepted the legal services of his father and received independent advice from his close friend Jason and from legal counsel hired by his mother. Also noteworthy is that Jason never testified that Mac was incapacitated when he signed the bill of sale. Lastly, there was no unequivocal opinion about his mental capacity at the time he conveyed the guns. The facts before the chancellor did not set the stage for an inter vivos gift. We affirm the chancellor's ruling as it is not manifestly wrong or in error.

¶21. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, McDONALD AND McCARTY, JJ., CONCUR. LAWRENCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY J. WILSON, P.J., TINDELL AND C. WILSON, JJ.**

**LAWRENCE, J., DISSENTING:**

¶22.     The majority opinion does what the chancellor did not. It finds that the bill of sale was a legal contract with good and valuable consideration. The problem is that the chancellor never found what the majority now finds. There is little doubt in Mississippi law that a bill of sale can represent a transfer of property by either a contract, which to be valid would require consideration along with several other factors, or an inter vivos gift. The majority concludes that, in this case, the transfer of the gun collection was the result of a valid contract. The chancellor never found that, and he never used those words. He merely said the bill of sale was valid without articulating what exactly the document was and whether the essential elements were met. The chancellor also never completed an analysis of the other essential elements necessary for a contract. The chancellor never completed an analysis of the essential elements necessary for a valid gift. Because there are different legal standards as to whether a transfer is a valid contract or an inter vivos gift, and the chancellor never articulated which standard he used or exactly what type of transfer occurred, I respectfully dissent. I would reverse and remand this case to the chancery court for a factual determination as to exactly what standard the chancellor employed and specifically what he found the document operated as under the law.

¶23.     The bill of sale in question was signed on April 2, 2010. It was never notarized. The bill of sale included "all of [Mac's] remaining firearms and ammunition, gun safes, storage buildings or other shooting accessories not now held by agencies of the United States

13

government." Before Mac found trouble with the law, he was a firearms collector and dealer and possessed hundreds of firearms. While the bill of sale contained Dan's signature and what appeared to be Mac's signature, Beverly testified that Mac told her he never signed the bill of sale. After the bill of sale was signed, Mac wrote Dan a check to build a storage shed to store the vast gun collection not on Dan's property, but on the property of Jason Graham, who was a friend of Mac's.

¶24.    It is important to note that both Beverly, Mac's mother, and Dan testified that their son had mental illness. Beverly specifically testified that her son had schizophrenia and was prone to hallucinations. The chancellor first found in his order that "[d]uring this **entire time period**, Mac suffered from bouts of mental illness and drug abuse." (Emphasis added). Contrary to that finding of fact in his order, however, the chancellor also found "[t]here is no proof that, at the time of the bill of sale, that Mac was suffering from the effects of mental illness or under the effects of drugs . . . ." Those findings of fact seem inconsistent and contrary to the credible evidence provided by both Dan and Beverly.

¶25.    On May 5, 2010, Mac pleaded guilty to violating federal gun laws. He was placed on probation. In late 2013 or early 2014,[7] Mac sold some of his weapons that were in the possession of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to another gun dealer for approximately $262,000. Mac made a profit of approximately $250,000 from

---

[7] The actual date is unclear. This language was taken directly from the chancellor's opinion.

14

that sale. In 2014, Mac tried to take possession of the remaining items in the gun collection stored at Jason's home in order to sell them. Winford "Bud" May testified to an altercation between Mac and Jason and then Mac and Dan. Bud told the court that Jason met Mac outside of Jason's home. The chancellor specifically found that Mac announced his intention to take possession of the items in his gun collection that were in the storage shed. Jason called Dan, and Dan instructed him to not let Mac take the property. Bud testified that Mac was "irate" and "didn't want to leave without his guns." These series of transactions between Dan and Mac obviously indicate that Mac thought the guns were still his despite the bill of sale that is the subject of this case.

¶26. It is without dispute that in December 2015, Mac called Beverly, his mother, and told her he had some "unfinished business and needed a gun." Further, he told Beverly that he was "in the middle of [his] suicide" and that he had "one thing [he had] to do before [his] life [ended]." At this point, Mac drove to Beverly's home and retrieved a shotgun and then drove to Dan's home. While at Dan's home, Mac threw Molotov cocktails through two windows and attempted to drive his Lexus through the front door of Dan's home. Dan called the police, Mac was arrested, and several days later Mac tragically committed suicide while in jail.

¶27. The chancellor made eleven findings of fact following the August 2, 2017 hearing to determine the validity of the bill of sale. Among those findings of facts were the following:

    1.     There is no proof that Dan told Mac that he had to convey the property to him to secure or comply with a plea agreement;

15

2.      There is no proof that, at the time of the bill of sale, that Mac was suffering from the effects of mental illness or under the effects of drugs such as to prevent him from exercising his free will;

3.      Mac sought, and received, the independent private advice of his good friend, Jason Graham, and decided thereafter to **give the property to Dan**;

4.      That Mac had his criminal lawyer, Joe Holloman, available for advice;

5.      That Mac thereafter entered a free and voluntary plea of guilty to the federal charge;

6.      That Mac retained no access to the property;

7.      That some of the property was sold by Dan during Mac's lifetime and Dan received the proceeds, not Mac;

8.      That Mac sold the property specifically excluded from the Bill of Sale and received the proceeds;

9.      That from April 2010, until sometime in 2014, Mac made no attempt to claim the property;

10.     After he attempted to obtain possession of the property in 2014 and was rebuffed, he claimed there was no bill of sale, but made no further attempts, legally or otherwise, to secure the property; and

11.     There is no proof that, from April 2010 until his demise in December 2015, that Mac made any allegation that the bill of sale was improper and took no action to challenge its execution.

(Emphasis added). In finding number three, the chancellor concluded that "Mac sought, and received, the independent private advice of his good friend, Jason Graham, and decided thereafter to **give the property to Dan**." (Emphasis added). Despite the above findings of facts, the chancellor never indicated the exact manner in which the guns were given to Dan.

16

Was it a valid contract that met the essential elements required by Mississippi law, including consideration, or was it an inter vivos gift? The chancellor's eleven findings of fact could point to either conclusion. The chancellor never addressed the consideration issue, and in fact, the only time he mentioned the word consideration was in stating Beverly claimed "the bill of sale failed because of lack of consideration." The chancellor never again uttered the word "consideration" or for that matter the word "contract" in any of his findings and never analyzed what, if any, consideration occurred or what proof existed as to the other essential elements of a contract.

¶28.    A bill of sale acts as "[a]n instrument for conveying title to personal property, absolutely or by way of security." Black's Law Dictionary (10th ed. 2014). In order to form a valid contract, the laws of this state require each of the following elements: "(1) two or more contracting parties; (2) consideration; (3) an agreement that is sufficiently definite; (4) parties with the legal capacity to make a contract; (5) mutual assent; and (6) no legal prohibition precluding contract formation." *Gandy v. Estate of Ford*, 17 So. 3d 189, 193 (¶7) (Miss. Ct. App. 2009). To prove an inter vivos gift, clear and convincing evidence is required to prove: "(1) that the donor was competent to make a gift; (2) that the donation was a voluntary act and the donor had donative intent; (3) that the gift must be complete and not conditional; (4) that delivery was made; and (5) that the gift was irrevocable." *In re Estate of Laughter*, 23 So. 3d 1055, 1066 (¶50) (Miss. 2009). "A chancellor's finding of fact will not be disturbed unless manifestly wrong or clearly erroneous." *Lowrey v. Lowrey*, 25 So.

17

3d 274, 285 (¶26) (Miss. 2009) (internal quotation marks omitted). "However, the Court will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard." *Id*. (quoting *Owen v. Owen*, 928 So. 2d 156, 160 (¶10) (Miss. 2006)). In this case, we do not know which standard the chancellor applied or exactly what he found. He never indicated whether the bill of sale represented a valid contract or an inter vivos gift. Because he never said what the bill of sale represented, we do not know what standard was applied and if it was applied correctly. This Court should not have to guess or speculate at the rulings of the trial court. Because it is unclear which standard the chancellor applied and what he found as to the essential elements of each standard, this alone necessitates a reversal and a remand of this case for a further factual determination and application of the law.

¶29. In my opinion, the majority essentially admits that the chancellor failed to find sufficient facts to support a valid contract and consideration by asserting "one theory" and then "[a]nother theory" for the determination of whether legal consideration was given for this "contract." The majority states:

> It is an undisputed fact that Mac did not want the federal government to have access to all or part of his gun collection. That was something of value to Mac that motivated him to contract with his father. This is **one theory** that supports the element of consideration in the bill of sale. **Another theory** of consideration is Dan's successful representation of Mac in his criminal matters. Mac received the benefit of the legal services which led to lenient dispositions of his dual criminal matters. Although based on different reasons, we agree with the chancellor that the bill of sale is valid evidence of a contract. The chancellor had more than enough evidence not only to infer, but also definitely conclude, that there was a valid contract between father and son and

18

also attorney and client.

(Emphasis added). With all due respect, this Court is not the finder of fact. The chancellor never determined in his written order what the consideration was for the contract the majority now says is valid under Mississippi law. The majority is speculating what "theory" may prove consideration when that is not this Court's role. If this Court has to create theories as to consideration then that ipso facto proves the chancellor did not make such a finding. For if there was such a finding by the chancellor, we should simply be able to read the order of the chancery court for that determination. However, reading the order of the chancery court to determine what consideration was given or whether the transfer was or was not a contract or a gift provides no guidance. Why? Because the chancellor never stated in his order what served as consideration or whether this transfer was, in fact, a contract or a gift.

¶30. As stated previously, the only time the chancellor ever mentioned the word consideration was in describing Beverly's arguments and then never wrote the word again in his entire order. Further, the chancellor never mentioned the word "contract," "mutual assent," or any other element of a valid contract. Likewise, the chancellor never mentioned the standard of, or any findings of facts as to, the essential elements of a gift. The Mississippi Supreme Court made clear in *Century 21 Deep South Properties Ltd. v. Corson*, 612 So. 2d 359, 367 (Miss. 1992) (citing *Johnson v. Black*, 469 So. 2d 88, 90 (Miss. 1985)), that "this Court does not sit to redetermine questions of fact." We "may not credit unspoken findings not fairly inferrable from the trial court's action." *Id*. (quoting *Riddle v. State*, 580

19

So. 2d 1195, 1200 (Miss. 1991)). Simply put, the facts do not exist in this record to sufficiently establish that the bill of sale was intended to operate as a contract, with consideration, without further fact finding by the chancellor. It is not "fairly inferrable" whether the chancellor considered the bill of sale a valid contract or a valid inter vivos gift.

¶31. Further, Beverly alleged, whatever the transfer actually was, it was invalid because Dan and Mac had a fiduciary or confidential relationship, and Dan failed to rebut the presumption of undue influence that arose as a result of that relationship. *See In re Smith*, 170 So. 3d 530, 536-37 (¶¶15-17) (Miss. Ct. App. 2014). Beverly claims that because Dan was Mac's attorney at the time the bill of sale was signed, and because Dan counseled Mac that he could not "own" the weapons, there was a confidential relationship between the two. The supreme court has found that "[w]henever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other" there is a fiduciary relationship between the two. *Henricks v. James*, 421 So. 2d 1031, 1041 (Miss. 1982). The chancellor never addressed this assertion and the majority does not consider it either. The chancellor failed to set forth the correct legal standard he applied on this issue and the factual findings relating thereto.

¶32. Generally, "[a]s a practical matter, we can better perform our function if we know what the trial court did, and why." *Tricon Metals & Services Inc.* 516 So. 2d 236, 239 (Miss. 1987). The roles of this Court and the trial court are separate. *Id.* Our role is not as a trier of fact. *Id.* (citing *Allgood v. Allgood*, 473 So. 2d 416, 421 (Miss. 1985)). The transfer of

20

property from Mac to his father Dan is riddled with questions. Mainly, was the transfer a valid contract with legal consideration or was it a valid gift? Because there are factual determinations necessary as to exactly what the bill of sale represents that must be made before this Court can do its legally imposed duties, I would reverse and remand for further factual findings by the chancellor and an application of the law to those facts. Accordingly, I dissent.

**J. WILSON, P.J., TINDELL AND C. WILSON, JJ., JOIN THIS OPINION.**

21