# United States Court of Appeals
# for the Fifth Circuit

———————

No. 23-60316

———————

United States Court of Appeals
Fifth Circuit

**FILED**

July 23, 2024

Lyle W. Cayce
Clerk

Joseph Papin,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

University of Mississippi Medical Center,

*Defendant—Appellee/Cross-Appellant*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:17-CV-763

———————————————————————

Before Wiener, Haynes, and Higginson, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

This case arises out of the termination of a medical resident by the hospital at which he was employed. Appellee University of Mississippi Medical Center ("UMMC") terminated the employment contract of the Appellant, Dr. Joseph Papin, due to a series of complaints about his workplace behavior, culminating in a serious incident involving care of a patient with a severe wound. Following an eight-day trial, a jury found that UMMC breached a contract with Dr. Papin—not because UMMC had violated Dr. Papin's original employment contract, but because the director of its residency program, Dr. T. Mark Earl ("Dr. Earl"), had signed a "Remediation

Agreement" with Dr. Papin that would have given him sixty days to improve in the residency program. The jury found that this document was a contract, and that UMMC violated it when its Human Resources department terminated Dr. Papin's employment contract without letting him finish the remediation period. The jury awarded Dr. Papin $6,560,651 in damages: $14,651 in past lost earnings; $660,000 in past physical pain and suffering, mental suffering, or emotional distress; $886,000 in future physical pain and suffering, mental suffering, or emotional distress; and $5,000,000 in punitive damages.

The trial court set aside the jury's verdict when it granted UMMC's motion under FED. R. CIV. P. 50(b) for a judgment as a matter of law ("JMOL"). The trial court ruled that no reasonable jury could have found that the Remediation Agreement that Dr. Papin and Dr. Earl had signed was a contract, because Dr. Earl did not have the authority to enter into a contract on UMMC's behalf. The court also ruled conditionally on UMMC's alternative arguments for a JMOL in accordance with FED. R. CIV. P. 50(c)(1)'s provision for conditional rulings in a motion for a new trial, "in case the Fifth Circuit vacates or reverses its finding that the Remediation Agreement is not a contract." We AFFIRM the district court's grant of the JMOL to UMMC, so we do not address the district court's alternative holdings.

## I.

## A.

This case arises from the termination of Dr. Papin by the UMMC residency program in February 2017. Dr. Papin graduated from the University of Michigan Medical School in the spring of 2015, and took a one-year Health Services Research Fellowship there after graduation. Subsequently, he applied for residencies as a part of the National Resident Matching Program

("the Match"), through which he received an interview at UMMC.[1] He began his residency on or before July 1, 2016. UMMC hired Dr. Papin pursuant to a "House Officer Contract" running from June 28, 2016, to June 30, 2017.[2] That contract provided that:

> Disciplinary matters and grievances are primarily handled with the individual residency programs. Physician shall have the right to appeal as stated in the Handbook for Employees for matters related to employment, and general conduct; and shall have the right of appeal to the Graduate Medical Education Committee for all academic and medical matters.

The contract also required UMMC to "administer Physician's training program in accordance with the policies, rules and regulations of the Board of Trustees of Institutions of Higher Learning and the University of Mississippi," and gave UMMC the right to "terminate this contract at any time for malfeasance, inefficiency or contumacious conduct by Physician." The House Officer Contract was signed by three individuals: the Vice Chancellor for Health Affairs for the Board of Trustees, Institutions of Higher Learning (dated June 28, 2016); the Associate Dean for Graduate Medical Education (dated June 28, 2016); and Joseph Papin (dated June 20, 2016).

In Dr. Papin's account, the troubles with UMMC started in December 2016, when he sent a text message to his chief resident—identified at trial as Dr. Megan Mahoney—asking for permission to "go for a run around

---

[1] Dr. Papin alleges that, during the interview, he was asked if "he had applied to any other schools in the South." His theory of the case is inflected with references to the fact that he was not "a southerner." In his HR interview prior to his termination, he said that he believed many of the conflicts that he had at UMMC stemmed from the fact that he was not acculturated to the social mores and "pleasantries" of Mississippi.

[2] "House Officer" is the title that UMMC and other hospitals use for their medical residents.

campus with my pagers and cell" while he was on call. Dr. Mahoney responded that this was okay "as long as pagers work." But on December 15, 2016, he made the same request to Dr. Mahoney, who reacted poorly to his second request, responding after a tense exchange, "I will give you all the reasons why that is not ok later but #1 is you're first call."

Around the same time, Dr. Papin alleged, he was put on a "wound care team" of other residents and attending physicians for a paralytic patient who had a "healed or healing bed sore." The wound care team had chosen a plan of "conservative, topical treatment." Dr. Papin alleged that on December 22, 2016, he consulted with his chief resident about the sore and, when asked if he had checked the patient's back, he answered "not today." Afterwards, he checked the patient's back again, as did the wound care team. The wound care team took a photo of the sore and continued recommending the conservative treatment plan. Dr. Papin alleged that he shared this information with his chief resident. After he left for a previously scheduled holiday in Florida, he alleged, the chief resident asked for the name of the patient with the bed sore via text message. While he was away, an attending physician examined the bed sore and saw that it was "far more severe than anyone else had supposed." Subsequently, the patient had surgery to remove the damaged tissue.

On January 10, 2017, Dr. Papin alleged, he agreed to enter into a written formal remediation plan ("Remediation Agreement") with Dr. Earl, the director of the residency program, stating that Dr. Papin's performance was deficient in five respects: "[l]ying and being untruthful about patient care"; "[l]eaving the hospital during duty hours (to exercise) – dereliction of duty"; "[u]nwillingness to help with tasks"; "[c]ondescending tone to nurses and fellow residents"; and "[p]oor inter-professional communication." However, Dr. Papin disputed that the bed sore incident was evidence of lying,

4

because he had made the same mistake as the rest of the team members in failing to identify its seriousness.

According to the Remediation Agreement, Dr. Papin would have sixty days from January 10, 2017 to "show significant improvement" in the five areas mentioned in the agreement, with zero incidents of lying, dereliction of duty, or unwillingness to complete a task, and improvement in his evaluations. The plan required him to submit a "Personal Study and Action Plan" by January 17 and have progress meetings with Dr. Earl. The Remediation Agreement then provided next steps if he did not show improvement, including immediate termination, non-renewal of contract, probation, or a requirement to repeat a year of training.

After the agreement was signed, however, Dr. Earl told Dr. Papin that he would be placed on administrative leave, pending completion of a drug test and fitness for duty examination. Dr. Papin alleged that, though he successfully completed the drug test and exam, Dr. Earl said that he had to remain on administrative suspension due to an "HR Complaint" commenced by Dr. Earl.

Dr. Papin alleged that, though he completed his Personal Study and Action Plan, as required, he heard nothing from UMMC until he was called in on February 20, 2017. During that meeting, he was fired for lying about the bed sore. Dr. Papin again disputed the characterization of the bed sore incident, but to no avail. After he was fired, he retained counsel, who sought an appeal with UMMC. He alleged that UMMC failed to respond to his counsel's request for an appeal for several months, until he sent a notice of his intent to sue and filed an administrative charge with the Equal Employment Opportunity Commission. At his internal appeal hearing, Dr. Papin alleged, Dr. Earl and other colleagues in management revealed other reasons for Dr. Papin's termination, including that he had behaved inappropriately to a

female co-worker, that he had lied about the work he did before rounds, and that he had "exchanged angry words" with another employee. Dr. Papin alleged that, at the hearing, he was not allowed to elicit any testimony other than his own, and that the language of the committee members indicated that they had a "retaliatory animus" towards him because he filed a lawsuit.

At trial on Dr. Papin's lawsuit, the testimony of events by both parties largely aligned with the allegations of Dr. Papin's complaint—but with a sharp divergence as to the nature and frequency of Dr. Papin's conflicts with his supervisors and colleagues throughout the time he spent at UMMC.

Despite Dr. Papin's account that his troubles started in December, other witnesses spoke of concerns that arose at the beginning of his residency. In July, he got into an argument with a nurse practitioner after Dr. Papin said he planned to leave the floor where he was working to go to the operating room, which Dr. Papin said an attending physician had told him he could do if his floor was slow. The nurse practitioner told Dr. Papin to stay on the floor where he was assigned to work, and Dr. Papin told the nurse practitioner "You're not my boss." In UMMC's account, Dr. Earl received numerous complaints throughout Dr. Papin's different fall rotations that Dr. Papin refused to do tasks that nurse practitioners and nurses asked him to do, and Dr. Earl personally met with Dr. Papin multiple times to encourage him to alter his behavior. In written feedback, numerous attending physicians expressed concern about his "abysmal" communication skills, "problems with patient care follow-up," and "poor insight [in]to his own behavior."

The deposition of Dr. Megan Mahoney, the chief resident who had engaged in the conversations with Dr. Papin about going running during his shift, was read aloud at trial. In her deposition, Dr. Mahoney testified that she created a system of numbers that she used to tell Dr. Papin not to engage in certain behaviors so that she did not have to "call him out in front of

people" when he was being a "douche" or showing "arrogance"—a system she had never had to impose with any other resident. Regarding the ulcer incident, Dr. Mahoney testified, she felt that regardless of whether other medical professionals were also responsible for the patient's care, Dr. Papin had not "met the standard of care" because it was his duty to look at the patient's backside to check for ulcers, and he failed to bring it up to her during their morning check-ins about the patient for more than thirteen days. Because he did not give her accurate information, she could not recommend timely intervention to the attending physician, and the patient's tissue had to be surgically removed. When she chose to report the incident to Dr. Earl, she testified, "the concern wasn't the wound . . . ; it was that [Dr. Papin] had lied about it to me."

Dr. Earl testified that after Dr. Mahoney reported the incident to him, he called Dr. Papin into his office on January 11, 2017 to discuss the ongoing problems and his new concerns about patient safety. At that meeting, Dr. Earl gave Dr. Papin the Remediation Agreement, which was dated January 10, 2017 and detailed the areas of concern regarding Dr. Papin's performance. Dr. Earl testified, "I wanted it acknowledged in perpetuity that he had been given this, and he had had the opportunity to review this document." When asked during direct examination why he believed sixty days was the appropriate remediation period, Dr. Earl stated that he thought this was necessary to start formal proceedings because "I don't have the power to terminate employees from the University of Mississippi Medical Center."

After the meeting with Dr. Papin, Dr. Earl testified that he went to the graduate medical education office to meet with his supervisor, Dr. Richard Barr, and that during the meeting he showed him the Remediation Agreement and expressed his concerns about patient safety. Dr. Earl testified that, given the patient safety concerns, Dr. Barr said that "we need to pull him from duty now and turn this over to HR." As to why Dr. Earl went to HR

before the sixty days outlined in the Remediation Agreement had concluded, he testified:

> I felt he was a threat to patient safety and had serious behavioral concerns regarding him proceeding in the program, but just formal remediation leading to termination is the only avenue I have as a program . . . director. But it wasn't until I met with Dr. Barr that he told me that we could—you know, oh, no, we can turn this over to HR and send him for—have them evaluate him for termination.

On January 27, 2017, members of the HR department conducted an interview with Dr. Papin, during which they asked him questions about the incidents that had been alleged in the previous months. On February 20, 2017, HR officers met and approved Dr. Papin's dismissal. Patricia Whitlock, an HR officer at UMMC, testified that she did not have the power to terminate Dr. Papin's contract. Instead, HR would have received a recommendation from the medical residency program, and "once that recommendation was reviewed, then the ultimate decision would have been made by the Office of Employee Relations, which is a part of human resources." Dr. Papin testified that he was called in on February 22, 2017 to be dismissed. After his internal appeal failed, Dr. Papin testified, he began applying for jobs in management consulting:

> It seemed kind of like the most natural fit, because I knew I was done. I mean, when you apply to residencies, you have to check a box that says you've been dismissed from residencies. And it's also not like most normal jobs too. These residency programs would have to speak with Dr. Earl, and, you know, when you're accused of being a danger to patients, lying, you know, some of the worst things that you can accuse a human being of

No. 23-60316

being, you know, sexual harasser, things like that, who's going to give me a job?[3]

After the close of Dr. Papin's case, on October 17, 2022, UMMC sought a JMOL on Dr. Papin's breach of contract claim. After hearing oral argument, the court denied the motion, and UMMC presented its evidence for the remainder of the trial. On October 20, 2022, after the parties rested, UMMC

---

[3] The reference to being seen as a "sexual harasser" related to the testimony of Will Crews, a medical student intern who was called to testify by Dr. Papin about a statement that he had made during Dr. Papin's internal appeal hearing about Dr. Papin's behavior toward a female colleague that Crews claimed at the time was based on a direct conversation he had with her: "I don't think [Dr. Papin] ever made any physical moves on her, but there were times when it was our duty to see patients, especially on trauma team, as two medical students, and [Dr. Papin] would go out of his way to where it would just be him and my female partner rather than me and my medical student partner to go see patients." However, at trial Crews testified that his female partner, Jessica Arnold, had shared her concerns with other female students, and he had overheard the conversation because they were in the same room. In any case, he testified that no one from HR had followed up with him about this specific allegation, and that he was not sure if they had ever followed up with Arnold. Later in trial, during Dr. Papin's testimony, counsel for UMMC objected when Dr. Papin stated that allegations of sexual harassment, which had been referenced in a pre-trial court order that appeared on PACER, caused him emotional damages. UMMC objected because "there is no evidence in the record, there has not been and there will not be, that he was terminated for sexual harassment, that there was a Title IX proceeding of any kind, and to say that he saw something on the internet that accused him of being a sexual harasser is unduly prejudicial to the medical center, because that was not what was said, ever." The trial court told Dr. Papin's counsel, "I'm fine with you exploring with him the impact of what was perceived at the time by some as a sexual harassment allegation, like, that's what he perceived that she was alleging against him, what impact that had on him. But I'm not going to allow you to get into orders on the internet that came out of this court and the fact that they're easily searchable." Importantly, Title IX subjects federally-funded institutions like UMMC to certain obligations to investigate sexual harassment complaints. *See generally* 34 CFR § 106.30. Those obligations were not triggered here because Papin's dismissal was not related to sexual harassment allegations. As a result, his argument on appeal that the court erred by disallowing evidence related to Title IX investigations of other students fails.

renewed its motion for a JMOL. Also on October 20, 2022, the jury returned the verdict form marked as follows:

> 1. Do you find that Dr. Joseph Papin has proven, by a preponderance of the evidence, that the Defendant University of Mississippi Medical Center breached the House Officer Contract? NO
>
> 2. Do you find that the January 10, 2017, remediation document is a contract? YES . . . .
>
> . . . .
>
> . . . 3. Do you find that Dr. Joseph Papin has proven, by a preponderance of the evidence, that the Defendant University of Mississippi Medical Center breached the January 10, 2017, remediation document? YES
>
> 4. If you answered "YES" to Question #1 or Question #3, provide the amount of damages that would compensate Dr. Joseph Papin for harm caused by Defendant University of Mississippi Medical Center's breach of contract.
>
> > A. Past lost earnings: $14,651.00
> >
> > B. Past physical pain and suffering, mental suffering, or emotional distress: $660,000.00
> >
> > C. Future physical pain and suffering, mental suffering, or emotional distress: $886,000.00

Subsequently, the trial court heard oral argument from the parties as to whether punitive damages should be presented to the jury. Dr. Papin maintained that, because his claim was styled as a breach of contract action, punitive damages for his claim were not barred by the Mississippi Tort Claims Act ("MTCA"), which expressly bars recovery of such damages in tort suits. UMMC argued that the MTCA did apply, because punitive damages could only be awarded for a breach of contract when the breaching party exhibited behavior equivalent to an intentional tort. The court, finding that it was a

"close call," recalled the jury to the courtroom and instructed them on punitive damages. The jury then awarded Dr. Papin $5 million in punitive damages.

B.

On November 21, 2022, UMMC filed its renewed motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. Dr. Papin responded. On May 18, 2023, the trial court issued its order granting UMMC a JMOL or, if the JMOL is vacated or reversed on appeal, a set-aside of the punitive damages and either a new trial or remittitur of the emotional damages.

In granting the JMOL for UMMC, the trial court held the Remediation Agreement was not a valid contract because Dr. Earl did not have actual authority to enter into a contract on UMMC's behalf. This was so because UMMC is a public institution, and Mississippi law does not recognize general agency principles when it comes to public contracts. Rather, if "a particular manner of contracting is prescribed" for a contract with the state of Mississippi, "the manner is the measure of power and must be followed to create a valid contract." *Bruner v. Univ. of S. Miss.*, 501 So. 2d 1113, 1115 (Miss. 1987) (quoting *Am. Book Co. v. Vandiver*, 178 So. 598, 600 (Miss. 1938)).

Because UMMC is a public educational institution, it is governed by the Mississippi Institutions of Higher Learning ("IHL"), the power of which is defined by the Mississippi Constitution and state statute. According to statute, the IHL "[has] general supervision of the affairs of all the institutions of higher learning, including the departments and the schools thereof," including "general supervision of . . . the business methods and arrangement of accounts and records; the organization of the administrative plan of each institution; and all other matters incident to the proper functioning of the institutions." Miss. Code Ann. § 37-101-15(b).

The district court noted that the IHL also is endowed with the power to "adopt such bylaws and regulations from time to time as it deems expedient for the proper supervision and control of the several institutions of higher learning." *Id.* § 37-101-15(c). Those bylaws prescribe the "manner of contracting" for the IHL, including UMMC. *See Weible v. Univ. of S. Miss.*, 89 So. 3d 51, 59–64 (Miss. Ct. App. 2011) (holding that the executive director of a university center "did not have the authority to bind [the university] to a written contract, even if one had been formed" when IHL Bylaw 701.02 authorized only the "Institutional Executive Officer of each institution, or a designee as evidenced in writing . . . to sign all other official documents for and on behalf of the institution for which he or she is responsible.").

The trial court was "not convinced" by UMMC's argument that IHL Bylaw 707 applied. Bylaw 707 would have required the "chancellor, vice chancellor, or their written designee" to sign the Remediation Agreement. UMMC's basis for this argument was that the Vice Chancellor for Health Affairs signed Appellant's original House Officer Contract, and that the language mirrored that of the UMMC Faculty and Staff Handbook, which provides that "the chancellor of the University of Mississippi and the vice chancellor for health affairs are the only persons authorized to sign contracts, agreements[,] and other documents for and on behalf of [UMMC]. However, board policy allows the vice chancellor to delegate signature authority." But the trial court was skeptical that this was the right provision because the Bylaw allowed the "Institutional Executive Officers and the Commissioner . . . to approve and execute on behalf of their respective institutions all other *land, personal property[,] and service contracts*," (emphasis added) and did not explicitly mention employment contracts. Furthermore, the language about authorization for contracts in the Faculty and Staff Handbook appeared in the "General Policies and Regulations" section rather than in the sections about employment.

The trial court examined the sections of the IHL Bylaws and the UMMC Faculty and Staff Handbook that contained information about employment policy, positing that it was fitting that the "manner of contracting" for UMMC was likely found in the "employment practices" sections of the IHL Bylaws and the UMMC handbook. The court cited IHL Bylaw 401, which "empowers the Commissioner and the Institutional Executive Officers of the several institutions to make all appointments and promotions of faculty and staff," except in certain circumstances. Another rule, Bylaw 801, provides that "[t]he [IHL] Board requires that each institution develop, maintain, and follow written employment and/or hiring procedures for both faculty and staff." The district court then turned to the UMMC Faculty and Staff Handbook section that delineated the hiring procedures for medical residents:

> Recruitment, screening, and hiring of house officers are responsibilities of the training program director (department head) or designee and are subject to approval by the appropriate budget officers and the associate dean for graduate medical education in the School of Medicine.

The district court found that the applicability of this bylaw was supported in the record by the signature of the Associate Dean for Graduate Medical Education on Dr. Papin's original House Officer Contract.

Ultimately, the district court concluded that the creation of the Remediation Agreement complied with "neither" Bylaw 707 (which would have required the Vice Chancellor for Health Affairs's signature), to the extent that it applies, nor Bylaw 801 (which would have required the Associate Dean for Graduate Medical Education's signature). Because Dr. Papin did not present evidence that either of these officials delegated their power to Dr. Earl, he could not show that Dr. Earl had authority to enter into a binding contract with Dr. Papin on behalf of UMMC.

Dr. Papin timely appealed, and UMMC filed a notice of cross-appeal.

## II.

The appropriate standard of review for the court's denial of a motion for judgment as a matter of law is de novo. *Brown v. Bryan County*, 219 F.3d 450, 456 (5th Cir. 2000) (citation omitted). At the same time, "our standard of review with respect to a jury verdict is especially deferential." *Id.* A trial court may grant a motion for judgment as a matter of law if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). A court "should review all of the evidence in the record," not just "the evidence and reasonable inferences which tend to support the case of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (cleaned up). But "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.*

## III.

Dr. Papin argues that the trial court erred in granting the JMOL to UMMC because UMMC's guidelines allowed Dr. Earl to enter into "contracts" like the Remediation Agreement he signed with Dr. Papin. In addition, Dr. Papin argues that there was consideration for the Remediation Agreement because it required him to complete duties beyond those required in the House Officer Contract.

Dr. Papin's contention that Dr. Earl had the capacity to make contracts on UMMC's behalf hinges on Dr. Earl's status as the Program Director of the UMMC residency program, and on UMMC's general compliance with the Accreditation Council for Graduate Medical Education ("ACGME") guidelines, which dictated procedures for remediation plans and agreements like the one at issue here. Dr. Papin argues that these policies,

14

which UMMC had to follow to maintain its accreditation, "required UMMC to vest Dr. Earl with contractual remediation authority."

As to the first point, Dr. Papin points to testimony that Dr. Earl gave at trial. When asked "And you have authority to enter into remediation agreements with residents; correct?" he answered, "I do." Dr. Papin contends that this testimony "alone" should have resulted in the denial of UMMC's motion, but that Dr. Earl's authority is further evidenced by UMMC's "Guidelines for Academic Remediation," which states that remediation is at the discretion of the Program Director and that residents must meet with the Program Director to formulate a remediation plan. Citing his own brief in opposition to UMMC's motion for the JMOL, Dr. Papin argues that "UMMC's applicable policies devolved contracting power to any written UMMC 'designee,' . . . which Dr. Earl clearly was in the role of 'Program Director.'" Dr. Papin further suggests that, because Dr. Earl met with his own supervisor in the graduate medical education office, Dr. Richard Barr, "just minutes after making the Remediation Agreement," and Dr. Barr "did not bat an eye," it was clear that Dr. Earl had the authority to execute the agreement.

As to the ACGME guidelines, Dr. Papin cites the testimony of Dr. James Stewart, Associate Dean for Graduate Medical Education and the designated institutional officer at UMMC, for the proposition that program directors are in charge of remediation plans and agreements in accordance with the ACGME guidelines. Furthermore, he suggests that Dr. Earl had "executed other contracts to bind UMMC" between UMMC and the residents from the Match.[4] Dr. Papin's argument hinges on the notion that "UMMC

_____

[4] This is a misinterpretation of Dr. Earl's testimony, unless one takes an improbably broad view of what might constitute a contract creation process. At the point in the direct examination cited by Dr. Papin for this contention, Dr. Earl was not talking about creating

No. 23-60316

was obligated to conform to the ACGME guidelines," which "authorize a program director to enter into remediation agreements."

Dr. Papin objects to the district court's reliance on IHL Bylaws 707 and 801, which the court found provide that the Vice Chancellor (Bylaw 707) or Associate Dean for Graduate Medical Education (Bylaw 801) would have to expressly delegate their power to Dr. Earl for him to have authority to sign a binding contract. But Dr. Papin argues that Dr. Earl, because he was the Program Director, was inherently empowered to enter into such agreements according to the Faculty and Staff Handbook.[5]

IV.

_____

employment contracts with the residents who are chosen from the Match process, but rather how he and other faculty members evaluate Match applicants and choose whom they will rank in the institution's Match list before the results of the Match are tabulated:

Q. So after the interviews, when you're meeting with available faculty members and you're looking at all of the scores from the folks that you've interviewed, who ultimately makes the decision about what the rank list is going to look like?

A. Ultimately it's my responsibility as program director.

[5] Here, Dr. Papin states that entering the Remediation Agreement was "explicitly within [Dr. Earl's] 'responsibilities' under the express terms of the Faculty and Staff Handbook," but he cites the district court's order and does not cite exactly which section of the Faculty and Staff Handbook to which he attributed this notion. It seems he is likely referencing the following provision of the Faculty and Staff Handbook: "Recruitment, screening and hiring of house officers are responsibilities of the training program director (department head) or designee and are subject to approval by the appropriate budget officers and the associate dean for graduate medical education in the School of Medicine." In Dr. Papin's brief in support of his Motion for Summary Judgment, he also states that the Faculty and Staff Handbook requires "UMMC supervisors/managers to provide their employees with written notice of unsatisfactory behavior/performance that could lead to termination." However, the attached section of the Faculty and Staff Handbook explicitly cabins the scope of this requirement to an employee's "initial employment period," which it defines as "the first 90 days of employment." By Dr. Papin's own allegations, he started on or before July 1, 2016, so this would only apply to unsatisfactory behavior or performance that he exhibited before September 29, 2016.

16

No. 23-60316

"Under Mississippi law, a plaintiff asserting any breach-of-contract claim has the burden to prove by a preponderance of the evidence (1) that a valid and binding contract exists; and (2) that the defendant has broken or breached it without regard to the remedy sought or the actual damage sustained." *White v. Jernigan Copeland Attys., PLLC*, 346 So. 3d 887, 896 (Miss. 2022) (citations omitted). "The elements of a contract are '(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) *parties with legal capacity to make a contract*, (5) mutual assent, and (6) no legal prohibition precluding contract formation.'" *Id.* (emphasis in original) (citations omitted).

Essentially, Dr. Papin argues that the Remediation Agreement is a valid and binding contract because Dr. Earl had the capacity to enter into remediation agreements—and, in addition, because a penumbra emanating from the ACGME guidelines generally followed by the UMMC residency program and the duties ascribed to Dr. Earl as the Program Director gave Dr. Earl the authority to contract on behalf of the institution.

This might be cognizable if UMMC were a private institution. But Mississippi law is very clear that, when it comes to public institutions, a contract can only be executed by someone with actual authority. In Mississippi, "[i]n respect to public contracts where a particular manner of contracting is prescribed, the manner is the measure of power and must be followed to create a valid contract." *Bd. of Trs. of State Insts. of Higher Learning v. Peoples Bank of Miss., N.A.*, 538 So. 2d 361, 364-65 (Miss. 1989) (internal quotation marks and citation omitted). In *Peoples Bank*, the Mississippi Supreme Court rejected an argument by a copier company that a lease for four copiers and accessories to UMMC's dental school, signed by an employee of the dental school, was valid. *Id.* at 365. Because state law governed university purchases, and under relevant state-law provisions UMMC's "purchasing department has the sole responsibility of binding the Dental School or [UMMC] to a

17

written contract," the employee could not have entered into a binding agreement with an outside vendor without final authorization from the purchasing department and the accounting department. *Id.*

And *Peoples Bank* cites *Bruner v. University of Southern Mississippi*, in which the Mississippi Supreme Court affirmed a directed verdict awarded to the University of Southern Mississippi ("USM") defendants after a candidate for an assistant coaching position believed, based on the behavior and apparent authority of the coach, that he had the job. 501 So. 2d at 1114. The court held that, pursuant to state statute, the "*only* way" a valid employment contract is created with USM is through the approval, by the Board of Trustees of State Institutions of Higher Learning, of a nomination by USM's president. *Id.* at 1115.

Dr. Papin argues that this line of cases does not undermine his argument; rather, he suggests, it "supports Dr. Papin's use of Dr. Earl's direct testimony about 'authority.'" But this is a misreading of Dr. Earl's testimony, in which Dr. Earl made clear that he had authority to participate in the remediation process but made it equally clear that he did not have authority to hire, fire, or otherwise modify the contracts of house officers like Dr. Papin: Dr. Earl testified that he had never signed a house officer contract, that it was not part of his job responsibility, and that he had never been told he had the authority to sign or modify a house officer contract.

Dr. Earl further testified that he did not "have the power to terminate employees from the University of Mississippi Medical Center." When asked "Did you think you were giving [Dr. Papin] a new employment contract?" he responded, "No. I don't have the power to do that." He stated that Dr. Lou Ann Woodward, the Vice Chancellor for Health Affairs, had the power to give employment contracts, and that she had never given him the authority to amend an employment contract. Dr. Earl testified that, during his

conversation with Dr. Barr after he completed the Remediation Agreement with Dr. Papin, Dr. Barr asked him if he was concerned about patient safety. When he answered yes, he testified, "[Dr. Barr] said, [t]hen we need to pull him from duty now and turn this over to HR." There is no reasonable reading of the record that leads to the conclusion that Dr. Earl—or anyone else at UMMC—believed that Dr. Earl had the requisite authority to alter the terms of Dr. Papin's employment contract with UMMC. *See Bruner*, 501 So. 2d at 1116 ("We can only remind the appellant of the legal maxim, which states that a person, dealing with an agent, must know at his peril the extent of the agent's authority to bind his principal.").

Further, Dr. Papin cites no law or fact for his contention that the ACGME guidelines created or changed any obligations that UMMC had regarding its employment policies under Mississippi law. On cross-examination, UMMC counsel asked Dr. James Stewart, the current Associate Dean for Graduate Medical Education, if there is "anything in ACGME policies or guidelines that prohibits a member institution or a participant institution from carrying out its own human resources policies." He answered, "No, there is not." Dr. Papin does not point to any testimony or evidence to counter this statement.

Patricia Whitlock, an employee in the HR office, testified that medical residents are considered by UMMC to be "in a training program, but they're also considered an employee." She stated that this dual status created challenges for academic staff and HR employees in responding to personnel issues:

> There have been instances when there is a situation with a resident or some other trainee that the department and the [Graduate Medical Education] office chooses to handle and resolve under that area. There are other instances when it is determined that it should be -- or it is preferable to handle it as an

employee. A lot of times those areas blur, and so it is difficult
sometimes to completely separate the two.

But, when asked if "the fact that Dr. Papin was promised that he would have 60 days to improve factor[ed] into your decision to recommend his termination," Whitlock answered, "It did not."

It is clear, by way of caselaw and an extensive scaffolding of statutes, that Mississippi law disfavors liability for public institutions arising from the actions of lower or mid-level employees. *See Weible*, 89 So. 3d at 59; *Peoples Bank*, 538 So. 2d at 364-65; *Bruner*, 501 So. 2d at 1115. Given the clarity of state law on the need for actual authority for valid public contracts, the district court did not err in its conclusion that the Bylaws and the UMMC Faculty and Staff Handbook supply the answer here: the Associate Dean for Graduate Medical Education and the Vice Chancellor for Health Affairs, not the director of the residency program, are responsible for entering into employment contracts with residents. This is further supported by the signature of both parties on Dr. Papin's initial House Officer Contract.

Furthermore, the testimony of Whitlock, Dr. Stewart, and Dr. Earl makes clear that the Remediation Agreement was an *academic* plan rather than a contract pertaining to Dr. Papin's *employment*. Dr. Earl was able to administer academic remedies but possessed no ability to render final decisions about Dr. Papin's employment status or negotiate on behalf of UMMC—those were, pursuant to IHL Bylaw 801 and the UMMC Faculty and Staff Handbook, "subject to approval by . . . the associate dean for graduate medical education in the School of Medicine." Policies and Bylaws § 801.06

For these reasons, the district court did not err in rendering judgment for UMMC and vacating the jury verdict. We AFFIRM.

No. 23-60316

HAYNES, *Circuit Judge*, dissenting:

The issue of whether the Remediation Agreement was not a binding contract pertaining to Dr. Papin's employment is questionable, but I do not plan to offer a dissent on that issue. Instead, I think the critical part of this case is the unquestioned contract: the House Officer Contract. On that issue, I respectfully dissent from the majority opinion because I conclude that the district court erred by excluding relevant evidence regarding the definition of "contumacious conduct," as used in the House Officer Contract. Because that error was harmful, I would vacate and remand for a new trial on the House Officer Contract.

As the majority opinion acknowledges, the House Officer Contract gave UMMC the right to "terminate this contract at any time for malfeasance, inefficiency or contumacious conduct by [Dr. Papin]." Dr. Papin argues that UMMC breached that provision by firing him for illegitimate reasons that did not constitute "malfeasance, inefficiency or contumacious conduct." Because the House Officer Contract does not define those key terms, Dr. Papin sought to introduce evidence of how UMMC treated other residents who faced similar allegations as those made against Dr. Papin. The alleged purpose of this evidence was "for the jury to be able to see and hear the difference between terminable and non-terminable offenses to at least give them a baseline to understand what malfeasance, inefficiency and contumacious conduct means." Nevertheless, the district court ultimately prohibited Dr. Papin's counsel from eliciting "any testimony as to . . . any resident that's not Dr. Papin." According to the court, such evidence was not relevant and would confuse the jury.

But communications from the jury indicate that the excluded evidence could have been helpful and changed the verdict as to the House Officer Contract. During deliberations, the jury sent a question to the court asking,

21

"What is the meaning of contumacious conduct?" After discussing with the parties, the court did not provide the jury any substantive response. The jury continued deliberating before sending another note saying they were "deadlocked as to Question 1,"[1] regarding whether UMMC breached the House Officer Contract. Ultimately, the jury answered "no" to Question 1, but only after scratching out "yes":



1. Do you find that Dr. Joseph Papin has proven, by a preponderance of the evidence, that the Defendant University of Mississippi Medical Center breached the House Officer Contract?

_____ YES          _____ NO

We review a district court's evidentiary rulings for abuse of discretion. *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 581 (5th Cir. 2004). If we conclude the district court abused its discretion when excluding evidence, we apply the harmless error doctrine and ask whether "a substantial right of the complaining party was affected." *Id.* (quotation omitted). Reversal is warranted where the error had anything more than "a very slight effect on [the jury's] verdict." *See Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 202 (5th Cir. 2016) (quotation omitted).

Relevant evidence is generally admissible, FED. R. EVID. 402, but a court may exclude such evidence "if its probative value is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury," FED. R. EVID. 403. Here, the House Officer Contract does not define the terms "malfeasance, inefficiency or contumacious conduct," and UMMC does not appear to contest that those terms are ambiguous. Thus, extrinsic

---

[1] It is not clear from the transcript whether this is the jury's language or the court's paraphrasing.

evidence would have been relevant to determining what is a terminable offense under the House Officer Contract. *See McFarland v. McFarland*, 105 So. 3d 1111, 1119 (Miss. 2013) (stating that, under Mississippi law, courts interpreting an ambiguous contract may consider extrinsic evidence).

Yet the district court prohibited Dr. Papin from presenting such evidence to the jury. The record suggests that all residents at UMMC sign essentially the same House Officer Contract, including the same termination provision.[2] At trial, Dr. Papin offered evidence of how UMMC behaved towards other residents accused of potentially terminable offenses when those parties were bound by the same House Officer Contract that governed Dr. Papin's own employment. That is relevant extrinsic evidence regarding how UMMC interpreted the "malfeasance, inefficiency or contumacious conduct" language at issue here. *Cf. Kight v. Sheppard Bldg. Supply, Inc.*, 537 So. 2d 1355, 1358 (Miss. 1989) (stating that how a party behaves under a contract "is relevant extrinsic evidence, and often the best evidence of what the contract requires [it] to do").

Whether UMMC considered other residents' actions to be terminable offenses—or not—under the House Officer Contract is thus directly relevant to whether UMMC breached Dr. Papin's employment contract *in this case*. Contrary to UMMC's assertion, this evidence was not meant to compare Dr. Papin to other residents, but rather to help define ambiguous contractual terms governing Dr. Papin's employment at UMMC. Moreover, rather than confuse the jury, this excluded evidence could have helped answered its open question: "What is the meaning of contumacious conduct?" Importantly,

---

[2] At trial, Dr. Papin testified that all the residents received the House Officer Contract at the same time during orientation. In his brief, Dr. Papin asserts that "all residents received essentially the same contract," and UMMC does not refute that statement.

the jury's notes and verdict form suggest that at least some jurors had concerns in favor of Dr. Papin and might have resolved those concerns differently if presented with additional evidence regarding the definition of "contumacious conduct."

I thus conclude that the district court abused its discretion by excluding evidence about other residents' experiences, and that error affected the jury's verdict. Accordingly, I would grant Dr. Papin a new trial regarding whether UMMC breached the House Officer Contract. Because the majority opinion affirms the district court judgment in its entirety, I respectfully dissent.